**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**In re:**

**SCI DIRECT, LLC, et al.**

Reorganized Debtors

Case No. 17-61735

Chapter 11

Judge: Hon. Russ Kendig

---

**SCI DIRECT, LLC and**
**SUAREZ CORPORATION INDUSTRIES**

Plaintiffs

vs.

**DANIEL M. McDERMOTT**

Defendant

Adv. Pro. No. 19-06056

Judge: Hon. Russ Kendig

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, SCI Direct, LLC ("SCI Direct") and Suarez Corporation Industries ("Suarez Corp.") (collectively, "Reorganized Debtors" or "Plaintiffs"), hereby request, pursuant to *Federal Rule of Civil Procedure* 56(c) and *Federal Rule of Bankruptcy Procedure* 7056, that this Court grant summary judgment in favor of Plaintiffs and against Defendant, Daniel M. McDermott, United States Trustee for Region 9 ("Trustee"), on Plaintiffs' Adversary Complaint and request for declaratory judgment. Summary judgment in Plaintiffs' favor is warranted for the following reasons:

- In voluntarily commencing their underlying bankruptcy case, the Reorganized Debtors relied on the bankruptcy law in effect in 2017, including the maximum $30,000 UST fee set forth in 28 U.S.C. §1930(a)(6). However, ***the Bankruptcy Judgeship Act subsequently amended 28 U.S.C. §1930(a)(6) (the "Amendment") and escalated the maximum quarterly fee to $250,000, an increase of 833%***. The Trustee's attempts to retroactively apply the Amendment to Plaintiffs have already increased their UST fees by approximately

***500%***, and this percentage is likely to rise still more as the Reorganized Debtors' business continues to improve;

- ***Applying the Amendment to the Reorganized Debtors will violate the long-established principle of anti-retroactivity***: (1) because nothing in the statutory language or legislative history of 28 U.S.C. §1930(a)(6) shows *unmistakable* Congressional intent that the Amendment would apply to cases *already* pending at the time of its enactment and (2) because application of the Amendment to this case would have impermissibly retroactive effect on the Reorganized Debtors' duties and liabilities;

- Additionally, ***application of the Amendment to the Reorganized Debtors violates the Due Process Clause*** because the Reorganized Debtors did *not* have notice of the up to 833% UST fee increase, taking the maximum fee from $120,000 per year to $1,000,000 per year, *prior* to filing their Chapter 11 petition and thus did not have opportunity to pursue other options, such as restructuring outside of bankruptcy;

- ***The Amendment, as applied to Plaintiffs, also violates the Uniformity and Bankruptcy Clauses*** because, although UST Districts were mandated to adopt the increased fee schedule, adoption of the new UST fees was optional for Bankruptcy Administration Districts in the states of North Carolina and Alabama. As a result, a debtor whose case was pending in these states at the time the Amendment was enacted are *not* liable for the increased UST fees, while debtors whose cases were pending in the UST District at the time the Amendment was enacted, like Plaintiffs, *are liable for the increased fees*;

- Finally, given the lack of relationship between the services rendered by the trustees and the exorbitant fees charged to debtors whose businesses are more profitable, ***the UST fees set in 28 U.S.C. §1930(a)(6)(B) constitute an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment***; and

- The Reorganized Debtors and the Trustee dispute whether the increased UST fees apply to the Reorganized Debtors, and, thus, these issues are ripe for determination by this Court.

Date: February 18, 2020

Respectfully submitted,

**TZANGAS | PLAKAS | MANNOS | LTD.**

*/s/ Lauren A. Gribble*
James M. McHugh (0046636)
Lauren A. Gribble (0093627)
220 Market Avenue, South
Eighth Floor
Canton, Ohio 44702
Telephone: 330.455.6112
Facsimile: 330.455.2108
E-mail: jmchugh@lawlion.com
lgribble@lawlion.com

-and-

Anthony J. DeGirolamo (0059265)
3930 Fulton Drive, Suite 100B
Canton, Ohio 44718
Telephone: 330.305.9700
Facsimile: 330.305.9713
E-mail: ajdlaw@sbcglobal.net

*Attorneys for Plaintiffs/Reorganized Debtors SCI Direct, LLC and Suarez Corporation Industries*

## TABLE OF CONTENTS


I. STATEMENT OF FACTS ..... 3

A. The Reorganized Debtors Voluntarily Filed a Chapter 11 Petition on August 7, 2017. ..... 3

B. When the Reorganized Debtors Filed their Chapter 11 Petition, the Maximum UST Fee that Could be Charged was $30,000 per Quarter. ..... 4

C. Congress Amended 28 U.S.C. §1930(a)(6) Months After the Reorganized Debtors Filed their Petition and Increased the Maximum Quarterly UTS Fee from $30,000 to $250,000. ..... 5

D. Due to Enactment of the Amendment, the US Trustee Increased the Fees Charged to Suarez Corp. by Approximately 500%. ..... 5

E. Although Congress Made the UST Fee Increase Mandatory for the UST Districts, it did Not Make the Increase Mandatory for the Bankruptcy Administration Districts, and Consequently, the Judicial Conference did Not Apply the Fee Increase to Cases Pending Prior to October 1, 2018. ..... 6

F. The Reorganized Debtors and US Trustee Dispute whether the Amendment Applies to the Reorganized Debtors. ..... 7

II. STANDARD OF REVIEW ..... 7

III. LAW AND ARGUMENT ..... 8

A. There is No Dispute that This Court has the Authority to Issue a Declaratory Judgment Regarding the Rights and Legal Relations of the Parties with Respect to Amended 28 U.S.C. § 1930(a)(6)(B). ..... 8

B. Summary Judgment in Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Applying the Amendment to the Reorganized Debtors Violates the Presumption Against Statutory Retroactivity. ..... 9

1. The presumption against retroactive application of a newly enacted or amended statute absent explicit evidence that the Legislature intended the statute to apply retroactively is a principle long-held and respected by United States courts. ..... 9

2. The evidence not only demonstrates a lack of legislative intent to retroactively apply the Amendment but actually provides affirmative support to the contrary conclusion, that the Legislature did *not* intend the Amendment to apply retroactively. ..... 13

i. Congress did <u>not</u> expressly indicate that the Amendment was to apply to bankruptcy cases pending at the time of enactment. ..... 13

ii. Other bankruptcy courts have concluded that Congress did not intend for the Amendment to have retroactive application. ..... 15

iii. Application of the Amendment to the Reorganized Debtors would have an impermissibly retroactive effect and thus does not govern bankruptcy cases pending at the time of enactment, including the Reorganized Debtors' case. ..... 17

C. Summary Judgment in the Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Retroactive Application of the Amendment to the Reorganized Debtors Violates the Due Process Clause of the U.S. Constitution. 19

1. Retroactive application of a newly enacted or amended statute violates the Due Process Clause when it fails to provide sufficient notice. 19

2. Retroactive application of the Amendment to debtors whose cases were pending at the time of enactment, including the Reorganized Debtors, violates the Due Process Clause. 21

D. Summary Judgment in Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Applying the Amendment to the Reorganized Debtors Violates the Uniformity and Bankruptcy Clauses of the U.S. Constitution. 23

1. Statutes that apply differently in the UST Districts and the BA Districts violate the Uniformity and Bankruptcy Clauses, which require uniformity in the laws applied in the UST and BA Districts. 23

2. The Amendment violates the Uniformity and Bankruptcy Clauses because it made the UST fee increase mandatory in the UST Districts but permissive in the BA Districts. 25

i. The language of 28 U.S.C. §1930(a)(6)(B) is mandatory, while the language of 28 U.S.C. §1930(a)(7) is permissive. 25

ii. Debtors whose cases were pending in the BA Districts on the date that the Amendment was enacted will not be required to pay the increased fees, while UST District debtors, like the Reorganized Debtors will, are required to pay the increased fees. 26

iii. Other courts have held that application of the Amendment to already pending cases violates the Uniformity and Bankruptcy Clauses. 27

iv. Variation in law applicable to the UST and BA Districts has previously resulted in such laws being found unconstitutional under the Uniformity and Bankruptcy Clauses. 30

E. Summary Judgment in Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Retroactive Application of the Amendment to Reorganized Debtors Violates the Takings Clause of the U.S. Constitution. 34

1. The Takings Clause does not permit the taking of property, and any "user fee" to reimburse the government for the cost of services must be reasonable. 34

2. Application of the Amendment to the Reorganized Debtors is unconstitutional because the increased fees constitute a taking and not a reasonable user fee. 34

IV. CONCLUSION 37

CERTIFICATE OF SERVICE 38

APPENDIX 39

## I. STATEMENT OF FACTS

### A. The Reorganized Debtors Voluntarily Filed a Chapter 11 Petition on August 7, 2017.

The Reorganized Debtors began in business in 1968 when Benjamin Suarez ("Mr. Suarez") started a small business from his home which eventually became Suarez Corp., a large and formerly very successful direct marketing company. (Affidavit of Benjamin D. Suarez at ¶ 2, attached hereto as Exhibit 1, hereinafter "Suarez Aff. at ¶ _.") Following many failures and limited successes, the Reorganized Debtors became profitable in 1973 and experienced major growth during the 1990s and 2000s when Reorganized Debtors' annual sales went from approximately $16 million to over $200 million, reaching a high of over $400 million in 2008. (Id. at ¶ 3.)

Then, like many American businesses, Reorganized Debtors' business suffered because of the 2008-2009 Great Recession. (Id. at ¶ 4.) However, just as business had started to recover, the federal government initiated an extensive investigation of alleged federal campaign finance law violations in 2011. (Id. at ¶ 5.) This investigation resulted in indictments against Suarez Corp., Mr. Suarez, and Suarez Corp.'s chief financial officer in 2013. (Id. at ¶ 6.) Following a month-long trial in 2014, Mr. Suarez was convicted on one count and began serving a fifteen-month sentence at a federal facility in January 2015. (Id. at ¶ 7.) Mr. Suarez was released in early 2016. (Id.)

However, the Reorganized Debtors, already "wounded" by the nationwide economic downturn in 2008-2009, were not able to financially recover from the significant expense and major distraction of the federal investigation and indictments, which challenges were compounded by Mr. Suarez's lengthy absence, unfortunately leaving Suarez Corp. and its related entities insolvent, leading them to decide that filing for bankruptcy protection was the best option to preserve their business and assets. (Id. at ¶¶ 8-9.) Consequently, the Reorganized Debtors voluntarily filed their Chapter 11 petition on August 7, 2017. (Id. at ¶ 10.)

**B. When the Reorganized Debtors Filed their Chapter 11 Petition, the Maximum UST Fee that Could be Charged was $30,000 per Quarter.**

When the Reorganized Debtors filed their Bankruptcy Petitions on August 7, 2017, 28 U.S.C. §1930(a)(6) set forth the applicable United States Trustee ("UST") fees, stating in pertinent part:

> in addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $325 for each quarter in which disbursements total less than $15,000; $650 for each quarter in which disbursements total $15,000 or more but less than $75,000; $975 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,625 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,950 for each quarter in which disbursements total $225,000 or more but less than $300,000; $4,875 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $6,500 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $9,750 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $10,400 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $13,000 for each quarter in which disbursements total $5,000,000 or more but less than $15,000,000; $20,000 for each quarter in which disbursements total $15,000,000 or more but less than $30,000,000; $30,000 for each quarter in which disbursements total more than $30,000,000.

Thus, when the Plaintiffs filed their Bankruptcy Petition, the UST fee due to the United States Trustee in any given year could not exceed $30,000 per quarter or $120,000 per year. Subsequently, the Reorganized Debtors' First Amended Joint Plan of Reorganization was confirmed on February 25, 2019 and made effective on April 18, 2019. (See Docket of Case No. 17-61735.)

**C. Congress Amended 28 U.S.C. §1930(a)(6) Months After the Reorganized Debtors Filed their Petition and Increased the Maximum Yearly UTS Fee from $120,000 to $1 million.**

Then, subsequent to the Petition Date of August 7, 2017, Congress enacted the Bankruptcy Judgeship Act, which amended 28 U.S.C. §1930(a)(6) to include subparagraph (B). The Amendment was not passed by Congress until October 24, 2017 and did not go into effect until **October 26, 2017**, more than eleven weeks ***after*** the Reorganized Debtors filed their Chapter 11 proceeding.

The effect of this Amendment was to substantially increase UST fees for Chapter 11 debtors in UST Districts by adding the following provision to 28 U.S.C. §1930(a)(6):

> During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. §1930(a)(6)(B). Thus, the Amendment increased the UST quarterly fees required of all Chapter 11 debtors with disbursements of over $1,000,000 in any calendar quarter, including the Reorganized Debtors, ***from a maximum of* $30,000 ($120,000 annually) *to a maximum of* $250,000 ($1,000,000 annually)**. **<u>This Amendment increased the maximum UST fees by up to 833%</u>**.

**D. Due to Enactment of the Amendment, the US Trustee Increased the Fees Charged to Suarez Corp. by Approximately 500%.**

In the first three quarters of 2019, Suarez Corp. made cash disbursements and payments in the approximate amount of $6,500,000.00 per quarter. (Id. at ¶ 12.) Pursuant to the version of 28 U.S.C. §1930(a)(6) in effect on the Petition Date, the fees to be paid to the Trustee would have been $13,000 per quarter, for a total amount of $39,000 for the first three quarters of 2019.

However, by retroactively applying the Amendment to 28 U.S.C. §1930(a)(6)(B), the Trustee submitted invoices for UST fees to Suarez Corp. for the amount of $64,919 per quarter, for a total amount of $194,757 for the first three quarters of 2019. (Id. at ¶ 13.) ***By applying the Amendment to the Reorganized Debtors, the UST fees are increased by approximately 500%.***

**E. Although Congress Made the UST Fee Increase Mandatory for the UST Districts, it did Not Make the Increase Mandatory for the Bankruptcy Administration Districts, and Consequently, the Judicial Conference did Not Apply the Fee Increase to Cases Pending Prior to October 1, 2018.**

When Congress enacted the approximately 833% UST fee increase, it made clear that this increase was mandatory for UST Districts:

> …the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 **shall be** the lesser of 1 percent of such disbursements or $250,000. [emphasis added.]

28 U.S.C. §1930(a)(6)(B). However, the statute continues to address the UST fees due from Chapter 11 debtors who have filed petitions in the Bankruptcy Administration Districts in the States of North Carolina and Alabama ("BA Districts"), merely giving these BA Districts the ***option*** to require the same fees. 28 U.S.C. §1930(a)(7) provides that:

> ***In districts that are not part of a United States trustee region as defined in section 581 of this title***, the Judicial Conference of the United States **may** require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection. Such fees shall be deposited as offsetting receipts to the fund established under section 1931 of this title and shall remain available until expended. [emphasis added.]

As a result of this permissive language and in direct contrast to the increases immediately required in the UST Districts, the Judicial Conference of the United States ("JCUS") did **not** authorize the implementation of the Amendment and increase UST fees in the BA Districts **until October 1, 2018**, ***nine months after the effective date of the Amendment for UST Districts***. Furthermore, the Amendment was explicitly ***not*** applied to Chapter 11 cases then pending in the

BA Districts and was given prospective application only to Chapter 11 cases ***filed in the BA Districts on or after October 1, 2018***.

### F. The Reorganized Debtors and US Trustee Dispute whether the Amendment Applies to the Reorganized Debtors.

In light of the above, the Reorganized Debtors maintain that the Amendment which increased UST fees in 28 U.S.C. §1930(a)(6)(B) is unconstitutional as retroactively applied to the Reorganized Debtors, in violation of Article I, Section 8, Clause 1; Article I, Section 8 Clause 4; and the Fifth Amendment to the U.S. Constitution. However, the Trustee disputes that 28 U.S.C. §1930(a)(6)(B) is unconstitutional as applied to Plaintiffs and maintains that the increased UST fees should be charged. As a result, the Reorganized Debtors instituted this suit requesting a declaratory judgment.

## II. STANDARD OF REVIEW

The Sixth Circuit has described the standard of review applicable to motions for summary judgment as follows:

> Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "'might affect the outcome of the suit under the governing law.'" *Baker*, 936 F.3d at 529 (internal citation omitted). "Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact, the non-moving party must then come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citation omitted).

*McGee v. Armstrong*, 941 F.3d 859, 868 (6th Cir.2019). Generally, cases turning issues of statutory interpretation are well-suited to disposition on summary judgment as statutory interpretation is a question of law. *See, e.g., United States v. W. Virginia*, 339 F.3d 212, 214 (4th Cir.2003) ("Because this dispute ultimately turns entirely on a question of statutory interpretation, the district court properly proceeded to resolve the case on summary judgment").

## III. LAW AND ARGUMENT

### A. There is No Dispute that This Court has the Authority to Issue a Declaratory Judgment Regarding the Rights and Legal Relations of the Parties with Respect to Amended 28 U.S.C. § 1930(a)(6)(B).

28 U.S.C. § 2201(a) states that:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Further, it has been consistently recognized that "[b]ankruptcy courts are among the federal courts that may grant declaratory relief under this statute." *In re City of Cent. Falls, R.I.*, 468 B.R. 36, 44 (Bankr. D.R.I.2012), citing *Nipon v. Leslie Fay Co. Inc. (In re Leslie Fay Co. Inc.),* 216 B.R. 117, 134 (Bankr.S.D.N.Y.1997); *Downington Industrial and Agricultural School v. Commonwealth of Pennsylvania Dept. of Ed. (In re Downington Industrial and Agricultural School)*, 172 B.R. 813, 819 (Bankr.E.D.Pa.1994).

In this case, there is no dispute that an actual controversy exists between the Reorganized Debtors and the Trustee regarding the application of amended 28 U.S.C. § 1930(a)(6)(B) to the UST fees due from the Reorganized Debtors. The Reorganized Debtors maintain that retroactively applying the fees established in the Amendment violates the presumption against retroactive application in violation of the Fifth Amendment Taking Clause and Due Process Clause, as well as the Uniformity and Bankruptcy Clauses, and, as such, the Amendment should not be

retroactively applied to the Reorganized Debtors. However, the Trustee claims that retroactive application of the Amendment to the Reorganized Debtors is constitutional and, thus, the increased UST fees should be charged to the Reorganized Debtors. Consequently, this Court has the authority to issue a declaratory judgment resolving this dispute.

### B. Summary Judgment in Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Applying the Amendment to the Reorganized Debtors Violates the Presumption Against Statutory Retroactivity.

#### 1. The presumption against retroactive application of a newly enacted or amended statute absent explicit evidence that the Legislature intended the statute to apply retroactively is a principle long-held and respected by United States courts.

The United States Supreme Court has observed that "***the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic***," explaining that:

> Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.[18] For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser*, 494 U.S., at 855, 110 S.Ct., at 1586 (SCALIA, J., concurring). In a free, ***dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions***.

*Landgraf v. USI Film Products*, 511 U.S. 244, 265–66, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). [emphasis added.]

Although retroactive application of a statute is not strictly prohibited as it may "serve entirely benign and legitimate purposes," ***Congress must, nevertheless, first make clear its intent that the statute shall apply retroactively*** to help "ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness. *Id.* at 267–68.

Consequently, the United States Supreme Court has held that, "[s]ince the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights ***unless Congress had made clear its intent***." *Id.* at 270. [emphasis added.]

In order to determine whether a statute enacted after a lawsuit is filed applies to the pending litigation, the United States Supreme Court has instructed that:

> the court's first task is to determine ***whether Congress has expressly prescribed the statute's proper reach***. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine ***whether the new statute would have retroactive effect***, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. ***If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result***. [emphasis added.]

*Id.* at 280. Thus, "a court should **not** apply a newly enacted statutory provision retroactively ***to a pending case*** unless Congress has clearly stated that the provision should so apply." *Turkhan v. Perryman*, 188 F.3d 814, 825 (7th Cir.1999), citing *Landgraf*, 511 U.S. at 280; *see also Craig v. Eberly*, 164 F.3d 490, 494 (10th Cir.1998), citing *Landgraf* (accord).

"***The standard for concluding that Congress unambiguously expressed an intent that a statute apply retroactively is demanding***." *Sarmiento Cisneros v. U.S. Atty. Gen.*, 381 F.3d 1277, 1280 (11th Cir.2004), citing *Landgraf* at 280. [emphasis added.] Generally, courts have found that Congress expressed its intent clearly enough to authorize a retroactive effect ***only where the statutory language "was so clear that it could sustain only one interpretation.***" *Id.*, quoting *Lindh v. Murphy*, 521 U.S. 320, 328 n. 4, 117 S.Ct. 2059, 2064 n. 4, 138 L.Ed.2d 481 (1997). [emphasis added.] The determination of Congressional intent "may include an examination of standard ensigns of statutory construction, such as the statute's structure and legislative history." *United*

*States v. Miller*, 911 F.3d 638, 643 (1st Cir.2018), quoting *Lattab v. Ashcroft*, 384 F.3d 8, 14 (1st Cir.2004). However, "a statute that is ambiguous with respect to retroactive application is construed ... to be unambiguously prospective." *Jaghoori v. Holder*, 772 F.3d 764, 769 (4th Cir.2014), quoting *INS v. St. Cyr*, 533 U.S. 289, 320 n. 45, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

Then, absent unmistakable intent, courts must turn to consider the effect of the statute. *Id.* "Courts making such evaluations [of retroactive effect] should 'take sound guidance from familiar considerations of fair notice, reasonable reliance, and settled expectations.'" *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 892 (6th Cir.2016), quoting *BellSouth Telecomm., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 658 (6th Cir.2006). The Third Circuit expounded that:

> our analysis for retroactivity purposes must focus on: (1) the rights of action that the plaintiff possessed, and the extent of recovery available to him, under the law in effect when he initiated his suit against the defendant; and (2) the rights of action that the plaintiff possessed, and the extent of recovery available to him, in light of the intervening statute. ***If a new law restricts or impairs the plaintiff's rights of action or the potential recovery available to him under the law in effect when suit was commenced, that new law has a retroactive effect***. *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483 (observing that a statute has a retroactive effect if it "would impair rights a party possessed when he acted"). [emphasis added.]

*Monoson v. United States*, 516 F.3d 163, 168–69 (3d Cir.2008). Moreover, as observed by the Third Circuit, courts should use ***the date upon which the litigation was filed to determine whether a subsequently enacted statute has a retroactive effect***. *See Yu v. Brown*, 92 F.Supp.2d 1236, 1250–53 (D.N.M.2000) (considering the effect of an amendment to Immigration and Nationality Act, finding that "the most natural retroactivity reference point is to examine whether the Amendment has a retroactive effect *on applications pending at the time the Amendment was enacted*," and holding that the amendment could not be applied to pending applications due to its

impermissibly retroactive effect); *see also Alicea v. Citizens Bank of Pennsylvania*, W.D. Penn. No. 12–1750, 2013 WL 1891348, *3 (May 6, 2013) (holding that "Plaintiff's allegations are sufficient to establish a federal cause of action under the EFTA as it stood on December 3, 2012, *when plaintiff filed his Complaint*"). [emphasis added; attached at Appendix.]

The case of *Alfred Bone Shirt v. Hazeltine* illustrates the operation of these principles in an analogous situation. *See* D.S.D. No. 01-3032-KES, 2007 WL 9735805, *2–4 (Apr. 5, 2007), *aff'd sub nom. Bone Shirt v. Hazeltine*, 524 F.3d 863 (8th Cir.2008) [attached at Appendix]. In *Alfred Bone*, the plaintiffs filed a suit contending that the statewide legislative redistricting plan enacted by the South Dakota Legislature violated §§ 2 and 5 of the Voting Rights Act. *Id.* at *1. During the pendency of the litigation, "Congress adopted VRARA," Section 6 of which "amended 42 U.S.C. § 1973l(e) and grant[ed] the court discretion to award 'reasonable expert fees' to the prevailing party in a Voting Rights Act case." *Id.* The plaintiffs subsequently argued that they were entitled to an award of expert witness fees based on Section 6 of VRARA. *Id.*

In ruling on plaintiffs' request, the court noted that, "[p]ursuant to the traditional presumption against retroactivity, plaintiffs cannot recover expert witness fees pursuant to § 6 if application of § 6 has a retroactive effect." *Id.* at *3. After reviewing the principles previously set forth, the court continued to find that "application of § 6 here would have retroactive effect," noting that:

> before adoption of § 6 of VRARA, expert witness fees were not recoverable in Voting Rights Act cases. See Emery v. Hunt, 272 F.3d 1042, 1048-49 (8th Cir. 2001). As a result, when the expert witness fees were incurred in this case, ***the parties reasonably expected that plaintiffs could not shift those fees to State***. **By now permitting the shifting of expert witness fees because § 6 was adopted after those fees were incurred would attach "'new legal consequences to events completed before [§ 6's] enactment**.'" Martin, 527 U.S. at 357, 199 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 270, 114 S. Ct. 1483). [emphasis added.]

*Id.* The court explained that "the award of expert witness fees pursuant to § 6 of VRARA would upset the reasonable expectation of the parties in this case and would create new legal consequences for services provided prior to adoption of § 6," creating a retroactive effect. *Id.* at *4. Consequently, the court held, "And because Congress did not provide clear intent that § 6 should apply retroactively, the court refuses to apply it here. Plaintiffs' request for expert witness fees is thus denied." *Id. See also Chappel v. Dickerson*, 238 F.3d 427 (9th Cir.2000) (refusing to apply the Prisoner Litigation Reform Act to an inmate's pending claim for psychological injury due to its retroactive effect and finding that, "[a]pplying pre-PLRA law, a prisoner's claim for psychological injury is cognizable under § 1983").

The same conclusion follows here because: (1) the application of the Amendment to cases that were pending at the time of its enactment has an improper retroactive effect and (2) there is no evidence that the Legislature intended the Amendment to apply retroactively.

**2. The evidence not only demonstrates a lack of legislative intent to retroactively apply the Amendment but actually provides affirmative support to the contrary conclusion, that the Legislature did *not* intend the Amendment to apply retroactively.**

**i. Congress did <u>not</u> expressly indicate that the Amendment was to apply to bankruptcy cases pending at the time of enactment.**

***First***, to determine whether the Amendment applies to cases pending at the time of enactment, this Court must determine whether Congress expressly indicated that the Amendment would apply retroactively.

A review of 28 U.S.C. §1930 reveals that there is <u>**no**</u> ***explicit provision*** that the Amendment applies to cases pending on or before the date of enactment. *See* 28 U.S.C. §1930. However, the Legislature certainly knows how to explicitly express its intent that a statute will have retroactive

application; indeed, in the same bill that enacted the Amendment, Congress also made amendments to the statutes governing Chapter 11 petitions and included the following:

> (c) ***EFFECTIVE DATE***.—The amendments made by this section shall apply to—
> (1) any bankruptcy case—
> (A) ***that is pending on the date of enactment of this Act***;
> (B) in which the plan under chapter 12 of title 11, United States Code, has not been confirmed on the date of enactment of this Act; and
> (C) relating to which an order of discharge under section 1228 of title 11, United States Code, has not been entered; and
> (2) any bankruptcy case ***that commences on or after the date of enactment of this Act***. [emphasis added.]

Additional Supplemental Appropriations for Disaster Relief Requirements Act, ACT, 2017, Pub. Laws 115-72, October 26, 2017, 131 Stat 1224. ***No*** such provision is included in the sections of the bill amending 28 U.S.C. §1930. As such, **the only logical conclusion is that Congress did not intend 28 U.S.C. §1930 to apply to bankruptcy cases pending on the date of its enactment**. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").[1] [internal citations omitted.]

In fact, prior versions of 28 U.S.C. §1930 lead to the same conclusion. "Before 1996, § 1930(a)(6) required the payment of quarterly fees 'in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) *until a plan is confirmed* or the case is converted or dismissed, whichever occurs first.'" *In re Life Partners Holdings, Inc.*, 606 B.R. 277, 284 (Bankr.

---

[1] *See also In re Parkwood, Inc.*, 461 F.2d 158, 166–67 (D.C.Cir.1971) (noting that "[i]f Congress, when it exempted life insurance companies from the coverage of the Loan Shark Act in 1963, had intended to validate previous transactions made by life insurance companies in violation of the Loan Shark Act, ***it could have done so by providing that the exemption granted in 1963 would have a retroactive effect. It did not do so***.") [emphasis added.]

N.D. Tex.2019), quoting 28 U.S.C. § 1930(a)(6) (1995).[2] [emphasis *sic*.] Then, Congress enacted the Balanced Budget Downpayment Act on January 27, 1996, which "amended § 1930(a)(6) to require the payment of quarterly fees 'in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed whichever occurs first'" and thus "removed the words 'until a plan is confirmed.'" *Id.* Courts could not agree whether the 1996 amendment imposed fees on Chapter 11 debtors whose plans of reorganization had already been confirmed, and, apparently in response to this disagreement, the Legislature "enacted the Omnibus Consolidated Appropriations Act on September 30, 1996." *Id.* at 284-85. This legislation expressly provided that the 1996 amended applied to all cases, including pending cases:

> Section 101(a) of Public Law 104–91, as amended by section 211 of Public Law 104–99, is further amended by inserting ": Provided further, That, notwithstanding any other provision of law, the fees under 28 U.S.C. 1930(a)(6) shall accrue and be payable from and after January 27, 1996, *in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans*" after "enacted into law".

*Id.*, quoting Pub. L. 104-208, 110 Stat. 3009. ed). Again, no such language was included in the 2017 Amendment to 28 U.S.C. § 1930(a). Thus, the "demanding" standard to show retroactive intent has not been met, and it can follow only that Congress did ***not*** intend for the Amendment to have retroactive application.

**ii. Other bankruptcy courts have concluded that Congress did not intend for the Amendment to have retroactive application.**

***Second,*** other bankruptcy courts that have reviewed this issue have reached the same conclusion. For instance, in *In re Buffets, LLC*, the U.S. Bankruptcy Court for the Western District of Texas observed that:

[2] This case was recently appealed to the Fifth Circuit.

> Congress did not expressly prescribe the reach of § 1930(a)(6)(B). The text of the statute begins with "[d]uring each of fiscal years 2018 through 2022," but this does not indicate a clear intent by Congress to *retroactively* apply the fees to pending cases. 28 U.S.C. § 1930(a)(6)(B). [emphasis *sic*.]

597 B.R. 588, 596 (Bankr. W.D. Tex.2019).[3] Similarly, *In re Life Partners Holdings, Inc.*, the court observed that Congress did **not** expressly provide that the Amendment would have retroactive application and compared it with other statutes where such language was including. 606 B.R. at 285 The *Life Partners* court pointed out that:

> the 2017 Amendment contains no such express language making the increased fees payable regardless of when a case is filed and regardless of when a plan is confirmed. **Given the 833% increase in maximum quarterly fees under the 2017 Amendment to this *same* statute, the Court would expect Congress to have made its intent explicit—as it did in September 1996—had it intended the increased fees to apply to *pending* cases**. [italics sic; bold added.]

*Id.* The court concluded, "**The lack of such clear language is striking**." *Id.*

Additionally, ***neither*** the *Buffet* court ***nor*** the *Life Partners* court found ***anything*** in the legislative history of the enactment supporting the conclusion that Congress intended the Amendment to apply retroactively. *See Buffet* at 596 ("Nothing in the statute of the legislative history indicates that Congress intended the amendment to apply retroactively"); *Life Partners* at 285 ("The Court is not willing to fill in the gaps in the statute and legislative history by applying the amendment to cases that were pending as the 2017 Amendment date, especially given the astronomical increase in fees"). Consequently, both courts continued on to determine whether the Amendment would have a retroactive effect if applied to the debtors. *See id.*

[3] An appeal in this case is pending in the Fifth Circuit.

**iii. Application of the Amendment to the Reorganized Debtors would have an impermissibly retroactive effect and thus does not govern bankruptcy cases pending at the time of enactment, including the Reorganized Debtors' case.**

***Third***, this Court too must determine whether applying the Amendment to this case will have an impermissibly retroactive effect, that is, whether applying the Amendment to pending bankruptcy cases would impose "new duties and liabilities on the Reorganized Debtors with respect to transactions already completed." *Buffets* at 598.

Initially, it should be noted that the Reorganized Debtors ***voluntarily*** commenced the underlying Chapter 11 case in accordance with 11 U.S.C. § 301:

> A voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter.

In so doing, the Reorganized Debtors elected to proceed with Chapter 11 reorganization ***to the exclusion of other options***, such as restructuring the debts outside of bankruptcy. *See Buffet* at 597 (noting that debtors with knowledge of increased fees may take action to avoid the UST fees, such as restructuring outside of bankruptcy). (Suarez Aff. at ¶ 11.) The UST fees in effect at the time necessarily figured into the Reorganized Debtors' calculations to determine the most expedient course of action to address their financial problems. (Suarez Aff. at ¶ 11.)

Here, reasonable minds could conclude only that the Amendment will have an impermissibly retroactive effect on the Reorganized Debtors' duties and liabilities. As emphasized by the U.S. Supreme Court in *Landgraf*, "[t]he *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." 511 U.S. at 283-84. [emphasis sic.] Therefore, "[a]bsent clear congressional intent, the court is not to read 'a statute ***substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment***.'" *Buffets* at 598, quoting *id.* at 284. [emphasis added.]

For instance, in *In re Buffets, LLC,* the court determined that the Amendment should not apply to increase the UST fees paid by the reorganized debtors who had filed voluntary Chapter 11 petitions on March 7, 2016, explaining that:

> This increase in financial liability negatively impacts the Reorganized Debtors. The plan is well underway, and in this case, like many chapter 11 reorganizations, there are numerous unforeseen administrative expenses, which the Reorganized Debtors must pay, in addition to the day-to-day costs of running over 100 restaurants located all over the United States. ***An increase in UST fees to $ 250,000 per quarter ($ 1 million per year) requires the Debtors to pay 833 percent more in UST fees than were required at the time of filing the case*** or confirmation of a plan. ***The amendment to § 1930(a)(6) would allow the UST to divert funds from the Reorganized Debtors' already lean budget to their extreme detriment***. If the amendment applied to this case, the priority claimants would be at risk of non-payment and the plan's feasibility would be compromised. [emphasis added.]

*Id.* at 596. Thus, the court concluded that "Section 1930(a)(6)(B) cannot be applied retroactively in this case; therefore, the quarterly fee increase shall not be applied in this chapter 11 case." *Id.*

In this case, when the Reorganized Debtors filed their Chapter 11 petition on August 7, 2017, the maximum UST fee that they could be charged was $30,000/quarter or $120,000/year. However, ***under the Amendment, the maximum UST fee that they could be charged increased by approximately 833%, that is, $250,000/quarter or $1,000,000/year***. The devastating effect of this Amendment has already been felt by Suarez Corp., whose fees have increased by 500% based on the distributions it has made under the Plan. Now, rather than the $13,000 per quarter which would have been due under the prior version of 28 U.S.C. § 1930(a)(6), the Trustee has charged Suarez Corp. $64,919 per quarter in fees. (Suarez Aff. at ¶ 12.)

Moreover, as the Reorganized Debtors' business improves, the UST fee charges will only continue to increase, making it more difficult for the Reorganized Debtors to pay their creditors, prolonging the reorganization process, and thus undermining the policies underlying a Chapter 11

bankruptcy. *See Bank of America Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) (noting that "the two recognized policies underlying Chapter 11" are "preserving going concerns and ***maximizing property available to satisfy creditors***"); *In re 312 W. 91st St. Co., Inc.*, 35 B.R. 346, 347 (Bankr. S.D.N.Y.1983) ("The legislative purpose of Chapter 11 is ***the speedy rehabilitation of financially troubled businesses***"). [emphasis added.]

As such, ***the Amendment dramatically increased the extent of the Reorganized Debtors' obligations to the US Trustee during these Chapter 11 proceedings that were initiated prior to the Amendment, attaching a new legal significance to the Reorganized Debtors' decision to file a Chapter 11 petition in contravention of the parties' expectations***. *See Alfred Bone Shirt v. Hazeltine* at *4 ("the award of expert witness fees pursuant to § 6 of VRARA would upset the reasonable expectation of the parties in this case and would create new legal consequences for services provided prior to adoption of § 6"). Therefore, Reorganized Debtors maintain that the Amendment cannot be retroactively applied and that they are entitled to a declaratory judgment to that effect as a matter of law.

**C. Summary Judgment in the Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Retroactive Application of the Amendment to the Reorganized Debtors Violates the Due Process Clause of the U.S. Constitution.**

**1. Retroactive application of a newly enacted or amended statute violates the Due Process Clause when it fails to provide sufficient notice.**

As observed by the U.S. Supreme Court in *Landgraf*, the presumption against retroactive application of statutory law is expressed throughout the United States Constitution, including the Due Process Clause:

> ***The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation***; a

> justification sufficient to validate a statute's prospective application under the Clause "may not suffice" to warrant its retroactive application. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). [emphasis added.]

*Landgraf v. USI Film Products*, 511 U.S. at 266. Specifically, the Due Process Clause establishes that "[n]o person shall be deprived of life, liberty, or property without due process of law."

Central to the concept of due process is **<u>reasonable notice</u>**. *See Walker v. City of Hutchinson, Kan.*, 352 U.S. 112, 115, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (discussing the role of notice in ensuring that due process is satisfied). Stated differently, "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Products* at 265. These principles, including the presumption against retroactivity, serve to temper "[t]he Legislature's unmatched powers," which otherwise could "allow it to sweep away settled expectations suddenly and without individualized consideration." *Id.*

Given the fact that the presumption against retroactivity springs largely from due process concerns, determining whether retroactive application of a law violates due process essentially replicates the analysis set forth in the previous section. "The first step requires that [the trial court] 'ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively.'" *United States v. Reynard*, 473 F.3d 1008, 1014 (9th Cir.2007), quoting *INS v. St. Cyr*, 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). If Congressional intent to apply the statute retroactively is clear, the statute should be so applied unless the retroactive application is not "rationally related to a legitimate legislative purpose." *Kopec v. City of Elmhurst*, 193 F.3d 894, 903 (7th Cir.1999). However, ***if Congressional intent is ambiguous or unclear, the court continues to the second step and determines "whether application of the act violates the***

***Due Process Clause and consequently has a 'retroactive effect.'***" *An Na Peng v. Holder*, 673 F.3d 1248, 1254 (9th Cir.2012). [emphasis added.]

For instance, in *In re Pierce*, the bankruptcy court evaluated newly enacted 11 U.S.C. § 522(f), which dealt with the rights of a lien creditor. *See* 4 B.R. 671, 671–74 (Bankr. W.D. Okla.1980). After reviewing the statute, the court stated that it could "find no terms in the new Bankruptcy Act which by their unequivocal and inflexible import, show a manifest intention of the legislature that this act should be given retrospective effect so as to defeat the vested rights of a lien creditor." *Id.* at 674. Consequently, the court held that "[t]o allow retrospective application of 11 U.S.C. s 522(f) to the lien herein at issue ***would constitute a deprivation of constitutional due process to the defendant***" and refused to give retroactive application to the statute. *Id.* [emphasis added.] The Reorganized Debtors maintain that the same conclusion follows with respect to the Amendment.

**2. Retroactive application of the Amendment to debtors whose cases were pending at the time of enactment, including the Reorganized Debtors, violates the Due Process Clause.**

***First***, as set forth in the previous section, nothing in the text of 28 U.S.C. § 1930(a) or in its legislative history unequivocally and inflexibly demonstrates Congressional intent that the Amendment be given retroactive effect, while review of other provisions in the same bill and prior versions of the statute actually supports the conclusion that Congress did *not* intend that the Amendment apply to already pending cases.

***Second***, as has been concluded by other courts, application of the Amendment to bankruptcy cases already pending at the time of enactment violates the Due Process Clause.

For example, in *In re Buffet*, ***the court found that "[a]pplying the fees retroactively in this case did not provide the Reorganized Debtors with sufficient notice of the increased fees prior***

***to filing chapter 11*** or confirmation of a plan." 597 B.R. at 597. [emphasis added.] In making this finding, the court explained that:

> With the knowledge of the increased fees, future debtors may select pre-packaged plans or choose to restructure debts outside of bankruptcy to avoid the quarterly fees. ***The Reorganized Debtors in this case had no such opportunity***. [emphasis added.]

*Id.* Subsequently, the *Life Partners Holdings* court agreed with the reasoning of the *Buffets* court, finding that, "[f]or the reasons stated in *Buffets*, the amendment's possible application to cases that were filed prior to the enactment of the 2017 Amendment also violates the Due Process Clause" and observing that:

> If the fee increase were a modest increase (or even anything close to a modest increase) as it has been in the past, the Court would be more inclined to agree with the U.S. Trustee that Chapter 11 debtors have no constitutional right to insist that quarterly fees will remain static. But Congress crossed the line when (as the U.S. Trustee interprets the amendment) it applied an ***<u>833%</u>*** [sic] increase in maximum quarterly fees to the Life Partners Chapter 11 Cases *after* the creditors and parties in interest heavily negotiated the terms of the Plan, *after* the Plan was confirmed, and *after* the three successor entities under the Plan—including the PHT—were charged with monetizing the reorganized Debtors' remaining assets and making distributions to creditors. "***With the knowledge of the increased fees, future debtors may select pre-packaged plans or choose to restructure debts outside of bankruptcy to avoid the quarterly fees. The Reorganized Debtors in this case had no such opportunity***."[46] [emphasis added.]

606 B.R. at 288-89. Consequently, the court held that "the 2017 Amendment violates the Due Process Clause." *Id.* at 289.

Here, too, the Reorganized Debtors did **<u>not</u>** have notice of this exponential fee increase when they decided to pursue Chapter 11 bankruptcy, invested time and effort in preparing the petition, and began working with the court and creditors to develop a plan of reorganization. Given the immense negative impact of the fee increase on the reorganization process, had the

Reorganized Debtors known that ***up to $1 million (instead of $120,000) per year would go to pay trustee fees rather than paying their creditors***, the Reorganized Debtors could have attempted to restructure debts outside of bankruptcy before they considered filing for bankruptcy. (See Suarez Aff. at ¶ 11.) However, the Reorganized Debtors did ***not*** have the opportunity to do this. Applying the Amendment to the Reorganized Debtors thus fails to adhere to the notice requirements inherent in the Due Process Clause and thus violates the same. Consequently, the Reorganized Debtors request that this Court enter declaratory judgment in their favor and hold that such application is unconstitutional in violation of the Due Process Clause of the Fifth Amendment.

### D. Summary Judgment in Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Applying the Amendment to the Reorganized Debtors Violates the Uniformity and Bankruptcy Clauses of the U.S. Constitution.

#### 1. Statutes that apply differently in the UST Districts and the BA Districts violate the Uniformity and Bankruptcy Clauses, which require uniformity in the laws applied in the UST and BA Districts.

As observed by one court, "[t]he Constitution contemplates uniform laws on the subject of bankruptcy." *In re Grossman*, 538 B.R. 34, 41 (Bankr. E.D. Cal.2015), citing U.S. Const., art. 1, § 8. Specifically, "[t]he Bankruptcy Clause of the U.S. Constitution vests Congress with the power to establish 'uniform Laws on the subject of Bankruptcies throughout the United States[.]'" *In re McFarland*, 481 B.R. 242, 259 (Bankr. S.D. Ga.2012), *aff'd sub nom. McFarland v. Wallace*, 516 B.R. 665 (S.D.Ga.2014), *aff'd sub nom. In re McFarland*, 790 F.3d 1182 (11th Cir.2015), quoting U.S. Const. Art. I, § 8, cl. 4. "[T]he purpose and effect of [federal bankruptcy laws] are to ensure uniformity in treatment of state and private creditors." *In re DBSI, Inc.*, 463 B.R. 709, 713 (Bankr. D. Del.2012), quoting *Cent. Virginia Community College v. Katz*, 546 U.S. 356, 377 n.13, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006).

Initially, it should be noted that "the uniformity requirement is a limitation on congressional power," and, thus, "***when Congress enacts bankruptcy laws, they must be uniform in effect" to survive constitutional scrutiny***. *In re Earned Income Tax Credit Exemption Constitutional Challenge Cases*, 477 B.R. 791, 800 (Bankr. D. Kan.2012), *aff'd sub nom. In re Lea*, 2013 WL 4431267 (Aug. 16, 2013). [emphasis added.]

The import and effect of uniformity is well-established in federal law: "As early as the 1880's, federal courts held that **<u>in the bankruptcy context, the uniformity rule merely requires Congress to pass one law applicable to all states of the union</u>**." *Nehme v. I.N.S.*, 252 F.3d 415, 427–28 (5th Cir.2001), citing *Darling v. Berry*, 13 F. 659, 667–68 (C.C.D.Iowa 1882). [emphasis added.] Specifically, "[t]he uniformity required by the Bankruptcy Clause is geographical, not personal." *In re McFarland* at 259, citing *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188, 22 S.Ct. 857, 46 L.Ed. 1113 (1902). Furthermore, bankruptcy laws must "apply uniformly among classes of debtors." *In re Wood*, 866 F.2d 1367, 1372 (11th Cir.1989). As one court explained:

> Its requirements will be satisfied when ***the law applies "to a defined class of debtors,***" *Gibbons*, 455 U.S. at 473, 102 S.Ct. at 1178, ***and "when [the] existing obligations of a debtor are treated alike ... regardless of [where] the bankruptcy court sits."*** *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172, 67 S.Ct. 237, 244, 91 L.Ed. 162 (1946) (Frankfurter, J. concurring). [emphasis added.]

*In re Cross*, 255 B.R. 25, 30 (Bankr. N.D. Ind.2000). However, Congressional "[l]aws and actions resulting in nonuniform bankruptcy law [will be] struck down." *In re Claussen*, 118 B.R. 1009, 1021 (Bankr. D.S.D.1990).

2. **The Amendment violates the Uniformity and Bankruptcy Clauses because it made the UST fee increase mandatory in the UST Districts but permissive in the BA Districts.**

The Amendment violates the uniformity requirement because Congress passed one law applicable to the UST Districts and another law applicable to the BA Districts, namely, the states of North Carolina and Alabama. A review of the statutory language makes this abundantly clear, and this conclusion is further confirmed by the events following enactment of the Amendment and relevant case law.

i. **The language of 28 U.S.C. §1930(a)(6)(B) is mandatory, while the language of 28 U.S.C. §1930(a)(7) is permissive.**

***First***, 28 U.S.C. §1930(a)(6)(B) requires the UST Districts to apply the increased fees:

> …the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 **shall be** the lesser of 1 percent of such disbursements or $250,000. [emphasis added.]

However, 28 U.S.C. §1930(a)(7), which addresses the BA Districts, provides that the Judicial Conference is permitted to charge the same fees:

> ***In districts that are not part of a United States trustee region as defined in section 581 of this title***, the Judicial Conference of the United States **may** require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection. Such fees shall be deposited as offsetting receipts to the fund established under section 1931 of this title and shall remain available until expended. [emphasis added.]

Thus, one section of the statute uses "shall," while another uses "may."

The U.S. Supreme Court has instructed that, "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), citing *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Ordinarily, "shall" and "may" have contradictory implications, as "shall" means "[h]as a duty to; more broadly, is required to," while

"may" means "[t]o be permitted to." Black's Law Dictionary (11th ed. 2019). Thus, under 28 U.S.C. §1930(a), the UST fee increase is mandatory in the UST Districts, but optional in the BA Districts. Simply put, **there is *not* one law that governs UST fees in all federal bankruptcy courts and districts**.

**ii. Debtors whose cases were pending in the BA Districts on the date that the Amendment was enacted will not be required to pay the increased fees, while UST District debtors, like the Reorganized Debtors will, are required to pay the increased fees.**

***Second***, this conclusion is confirmed by the events in the UST and BA Districts after the Amendment was enacted. The UST Districts immediately began charging the increased UST fees in all cases pending on and filed after October 1, 2017, the date of enactment. However, consistent with the permissive language of 28 U.S.C. §1930(a)(7), the JCUS did **not** adopt the Amendment and increase UST fees in the BA Districts **until October 1, 2018**, ***nine months after the effective date of the Amendment for UST Districts***. Furthermore, ***the JCUS explicitly refused to retroactively apply*** the Amendment to Chapter 11 cases then pending in the BA Districts and decided it should apply only to Chapter 11 cases ***filed in the BA Districts on or after October 1, 2018***.

Consequently, due to Congress' failure to enact a uniform fee statute, debtors whose cases were pending in Alabama or North Carolina on October 1, 2017 are not required to pay the increased trustee fees, while debtors like the Reorganized Debtors, whose cases were then pending in the remaining states, are required to pay the increased fees. Clearly, the Amendment fails to meet the uniformity requirement established by the United States Constitution and thus should not be applied to the Reorganized Debtors.

### iii. Other courts have held that application of the Amendment to already pending cases violates the Uniformity and Bankruptcy Clauses.

***Third***, this has been the conclusion reached by other U.S. courts. In *In re Circuit City Stores*, *Inc.*, the Bankruptcy Court of the Eastern District of Virginia found that the Amendment violated the Uniformity and Bankruptcy Clauses. *See* 606 B.R. 260, 269–71 (Bankr. E.D. Va.2019).[4] The court observed that, "[w]hile the Bankruptcy Clause 'is not an Equal Protection Clause for bankrupts,' '[t]o survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors.'" *Id.* at 269, quoting *Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 470 n.11, 473, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982). The court then explained that:

> For the first three quarters of 2018, newly adopted section 1930(a)(6)(B) increased quarterly fees assessed against chapter 11 debtors in only 88 of the 94 federal judicial districts throughout the country. It was not until October 1, 2018, that the JCUS approved the imposition of quarterly fees on chapter 11 debtors in the BA Districts "in the amounts specified in 28 U.S.C. § 1930(a)(6)(B)." 2018 JCUS Report, *supra* note 11, at 11-12. The Bankruptcy Judgeship Act offered no justification for excluding the BA Districts from the fee step-up. "Under any standard of review, when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary." *In re Buffets*, 597 B.R. at 595 (quoting *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1532 (9th Cir. 1994), *amended by* 46 F.3d 969 (9th Cir. 1995)). Section 1930(a)(6)(B) contravened the Uniformity Clause through "actual geographic discrimination" for the first three quarters of 2018. *Ptasynski*, 462 U.S. at 85, 103 S.Ct. 2239.

*Id.* Furthermore, "[a]lthough the increased fees are now uniformly charged nationwide for debtors filing chapter 11 cases on or after October 1, 2018, ***debtors in pending cases filed before October 1, 2018 are still experiencing geographic discrimination without a discernable explanation***"

[4] This case was recently appealed to the Fourth Circuit.

because the JCUS determined that the Amendment would have prospective application only. *Id.* at 269-70. [emphasis added.]

The court continued to note that:

> The geographic discrimination that remains ongoing is particularly apparent in the case at bar. ***Had the Debtors filed their chapter 11 bankruptcy petitions a mere 140 miles south in Raleigh, North Carolina,[24] the Debtors would be paying substantially lower quarterly fees than they are paying now***. [emphasis added.]

*Id.* at 270. However, "[t]his is the type of 'regionalism' the Uniformity Clause was intended to prevent." *Id.*, citing *United States v. Ptasynski*, 462 U.S. 74, 81, 1983-2 C.B. 209, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983). Consequently, the *Circuit City* court found that, "[a]s the BA Districts do not apply section 1930(a)(6)(B)'s fee increase to pending cases, the fee increase cannot constitutionally be applied to pending cases outside of the BA Districts." Thus, ***the court, observing that "[t]he cost of a given bankruptcy proceeding for similarly situated debtors must be consistent in every judicial district throughout the country," ordered that the UST fees due by the debtors "must be determined based on the prior version of the statute."*** *Id.* at 271. [emphasis added.]

The *Life Partners* court arrived at the same conclusion. *See* 606 B.R. at 286–88. It unequivocally held that:

> the 2017 Amendment violates the Uniformity Clause[34] and the Bankruptcy Clause[35] of the U.S. Constitution because Chapter 11 debtors in U.S. Trustee districts will be forced to pay the higher quarterly fees regardless of when their cases were filed, but Chapter 11 debtors in BA districts will pay the higher quarterly fees only if those debtors filed their bankruptcy cases on or after October 1, 2018.

*Id.* at 286. The court then continued to address each of the counter arguments raised by the U.S. Trustee, finding that "[n]one of the arguments [were] persuasive":

- ***First***, the U.S. Trustee attempted to argue that "28 U.S.C. § 1930(a)(7) *mandates* that any fees charged in the BA districts *must* be the same as those prescribed in (a)(6) for U.S. Trustee districts." *Id.* [emphasis sic.] The court flatly disagreed, noting that, in direct contrast to the mandatory language of 28 U.S.C. § 1930(a)(6)(B), 28 U.S.C. § 1930(a)(7) employs permissive language. *Id.* As such, "§ 1930(a)(7) is not mandatory." *Id.*

- ***Next***, the U.S. Trustee argued that, even if the statute failed to impose uniform fees, "such a difference would not violate the Bankruptcy Clause because it is rationally justified" and citing the case of *In re Prines*. *Id.* at 287. Again, the *Life Partners* court did not agree, finding that the *Prines* case was distinguishable:

  > The *Prines* court was reviewing Congress's decision to make Chapter 11 debtors in U.S. Trustee pilot districts pay quarterly fees a year sooner than Chapter 11 debtors in non-pilot U.S. Trustee districts. The court concluded that Congress was rationally justified in providing that different treatment because Chapter 11 debtors in pilot districts began receiving U.S. Trustee supervision and support ***a year sooner than did Chapter 11 debtors in non-pilot districts***. [emphasis added.]

  *Id.* However, in the *Life Partners* case, the issue was "[w]hether Chapter 11 debtors that filed bankruptcy in U.S. Trustee districts before October 1, 2018 should pay significantly higher fees for the duration of their cases (which could last years) while Chapter 11 debtors that filed bankruptcy in BA districts before October 1, 2018 will continue to pay the significantly lower fees for the duration of their cases, ***all for the functionally equivalent support and supervision***." *Id.* [emphasis added.] However, the court found that "Congress has provided no justification—rational or otherwise—for that different treatment." *Id.*

- ***Third***, the U.S. Trustee attempted to claim that "§ 1930 is not a law 'on the subject of Bankruptcies' within the meaning of the Bankruptcy Clause…" *Id.* However, "bankruptcy" has been defined as the "'subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief.'" *Id.*, quoting *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. at 466. And the UST fees "are granted administrative claim status in bankruptcies, ***so any increase or decrease in fees payable to the U.S. Trustee affects the amount of funds available for distribution to lower-priority creditors and the debtor***." *Id.* at 288. [emphasis added.] Furthermore, the court found, "Section 1930 is critical to funding the U.S. Trustees, who have 'extensive discretion to appoint interim and successor trustees, monitor and supervise bankruptcy proceedings, examine debtors, advise the bankruptcy courts, and even, in some circumstances, to seek dismissal of cases.'[44] This statute thus has an effect on the rights and liabilities of both creditors and debtors." *Id.*

Then, having specifically rejected the Trustee's arguments, the *Life Partners* court continued to reason that:

> Taken to its logical extreme, the U.S. Trustee's argument would permit Congress to amend § 1930(a)(3) and (a)(6) to increase the filing fee for Chapter 11 debtors in South Dakota to $1 million (leaving it at $1,167 in the other forty-nine states), or to increase maximum Chapter 11 quarterly fees only for Chapter 11 debtors in Texas to $500 million, effectively killing bankruptcy relief in those states. ***The Bankruptcy Clause and Uniformity Clause would not permit such extreme non-uniform legislation, just as they do not permit the less extreme — but still significant — non-uniform legislation at issue before this Court***. [emphasis added.]

*Id.* Therefore, the court held that the Amendment violated the Uniformity and Bankruptcy Clauses and, as such, "the U.S. Trustee quarterly fees applicable in these Life Partners Chapter 11 Cases [would be] those fees in effect prior to the 2017 Amendment." *Id.* at 289.

**iv. Variation in law applicable to the UST and BA Districts has previously resulted in such laws being found unconstitutional under the Uniformity and Bankruptcy Clauses.**

***Fourth,*** and last, this is **not** the first time that variation in federal bankruptcy law as respectively applicable to the UST and BA Districts rendered it unconstitutional. In *St. Angelo v. Victoria Farms, Inc.*, the Ninth Circuit was called upon to determine whether Congress' decision not to implement the U.S. Trustee program in North Carolina and Alabama violated the Uniformity Clause. *See* 38 F.3d 1525, 1529–32 (9th Cir.1994), *amended*, 46 F.3d 969 (9th Cir.1995). In that case, the debtor, Victoria Farms, argued that 28 U.S.C. § 1930 was invalid under the Uniformity Clause "because the U.S. Trustee program—and the fee system which support[ed] it—[had] not been implemented in Alabama and North Carolina." *Id.* at 1529. Ultimately, ***the Ninth Circuit agreed***. *Id.* at 1532.

First, the court reviewed legislative action relating to the U.S. Trustee program and the exception of Alabama and North Carolina, noting that Congress initially created the U.S. Trustee program in eighteen judicial districts in an attempt to "alleviate some of the administrative burdens faced by bankruptcy judges, to eliminate the appearance of favoritism arising from the close

relationship that existed between judges and trustees, and to address the problem of 'cronyism that exists in many parts of the county in the appointment of trustees by bankruptcy judges.'" *Id.*, quoting H.Rep. No. 595, 95th Cong., 2d Sess. 108 (1978), *reprinted in* 1978 U.S.C.C.A.N. pp. 5787, 5963, 6069. "The success of the program prompted Congress to replace the pilot program with a permanent national program," which was phased in over a period of two years "for every state except North Carolina and Alabama." *Id.* For some reason, Alabama and North Carolina were not required to implement the program until October 1, 1992, although they could vote to adopt the program earlier. *Id.* Congress provided **no** explanation for its decision to exempt these two states from the timeline established for the other forty-eight states. *Id.* Subsequently, again without explanation, Congress extended the deadline for Alabama and North Carolina to implement the U.S. Trustee program ***by another ten years, to October 1, 2002***. *Id.*

The trustee attempted to justify this non-uniform approach by arguing that, "despite the absence of any congressional statement, Congress intended to create two parallel programs in order to study the effect of the U.S. Trustee system upon the administration of bankruptcy proceedings," claiming that his assertion was supported by a 1992 GAO report. *Id.* The court did **not** agree, pointing out that the GAO report explicitly noted, "[w]e could not find *any* justification for continuing two separate programs," and, as such, it directly contradicted and undermined the trustee's position. *Id.* at 1529-30.

The *St. Angelo* court next rejected the trustee's argument that "the U.S. Trustee program serve[d] a purely administrative function and therefore [was] not constrained by the requirements of the Uniformity Clause." *Id.* at 1530. It noted that "bankruptcy" is the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief" and observed that "[t]he statute clearly govern[ed] the relationship between creditor

and debtor…" *Id.*, quoting *Railway Labor Executives Ass'n v. Gibbons,* 455 U.S. 457, 466, 102 S.Ct. 1169, 1175, 71 L.Ed.2d 335 (1982). The court explained that:

> The U.S. Trustees have assumed the supervisory roles of the bankruptcy judges. Indeed, the statute entrusts U.S. Trustees with extensive discretion to appoint interim and successor trustees, monitor and supervise bankruptcy proceedings, examine debtors, advise the bankruptcy courts, and even, in some circumstances, to seek dismissal of cases. *See, e.g.,* 11 U.S.C. §§ 343, 701, 703, 704, 707 & 727; 28 U.S.C. § 586. Thus, ***the U.S. Trustees' activities have a direct effect upon the rights and liabilities of both debtors and creditors***. [emphasis added.]

*Id.* As such, it fell within the purview of the Uniformity Clause. *Id.*

However, the court continued to note, "The U.S. Trustee program is not only intimately connected to the government's regulation of the *relationship* between creditor and debtor, it also has a concrete effect upon the *relief* available to creditors." *Id.* at 1530-31. [emphasis sic.] Specifically, "[b]ecause debtors in states other than North Carolina and Alabama must pay higher fees for the supervision of bankruptcy proceedings, ***the current system reduce[d] the amount of funds that the debtor can ultimately pay to his creditors in the other 48 states***." *Id.* at 1531. [emphasis added.] This posed a problem under the requirements of the Uniformity Clause. *See id.*

Although the Uniformity Clause requires federal bankruptcy law to be geographically uniform, it has been recognized that "[a] bankruptcy law may have different effects in various states ***due to dissimilarities in state law as long as the federal law itself treats creditors and debtors alike***." *Id.* [emphasis added.] However, the Ninth Circuit continued to unequivocally state:

> ***It is clear that this is <u>not</u> a provision which has different effects within North Carolina and Alabama due to differences in the laws of these two states***. North Carolina and Alabama are the only states given the option to vote to adopt the U.S. Trustee system before the end of the implementation period, and these two states are the only ones that need not implement the system until October 1, 2002. **<u>It is federal law, rather than state law, that causes creditors and</u>**



19-06056-tnap Doc 22 FILED 02/18/20 ENTERED 02/18/20 15:34:26 Page 35 of 49

> **debtors to be treated differently in North Carolina and Alabama**. [emphasis added.]

*Id.* Although "Congress may enact non-uniform laws to deal with geographically isolated problems as long as the law operates uniformly upon a given class of creditors and debtors," "Congress … provided no indication that the exemption in question was intended to deal with a problem specific to North Carolina and Alabama." The court, moreover, was not able to "discern such a purpose in the structure of the statute or the legislative history of the amendment." *Id.* Instead, "because creditors and debtors in states other than North Carolina and Alabama [were] governed by a different, more costly system for resolving bankruptcy disputes, *see supra* p. 13243, it [was] clear that 28 U.S.C. § 1930, *as [then] amended,* [did] not apply uniformly to a defined class of debtors." *Id.* at 1531-32. [emphasis sic.]

This led the Ninth Circuit to find that:

> although the Supreme Court has not clearly articulated a standard for scrutinizing ***Congress' decision to enact non-uniform bankruptcy laws,***[5] ***section 317(a) must fail***. Under any standard of review, **when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary**. [emphasis added.]

*Id.* at 1532. Consequently, the *St. Angelo* court concluded, "***[W]e are required to hold that its decision to ignore the Uniformity Clause in enacting section 317(a) renders that section unconstitutional***." *Id.* [emphasis added.]

The Reorganized Debtors submit that the reasoning of the *Circuit City*, *Life Partners*, and *St. Angelo* courts is sound and applies directly to the case at bar, leading to the conclusion that application of the Amendment to the Reorganized Debtors violates the Uniformity and Bankruptcy Clauses. Therefore, the Reorganized Debtors respectfully request that this Court grant their Motion for Summary Judgment and issue a declaratory judgment to that effect.

E. **Summary Judgment in Reorganized Debtors' Favor is Warranted because Reasonable Minds Can Conclude Only that Retroactive Application of the Amendment to Reorganized Debtors Violates the Takings Clause of the U.S. Constitution.**

1. **The Takings Clause does not permit the taking of property, and any "user fee" to reimburse the government for the cost of services must be reasonable.**

The United States Supreme Court has noted that:

> The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amdt. 5. It protects "private property" without any distinction between different types.

*Horne v. Dept. of Agriculture*, 135 S.Ct. 2419, 2426, 192 L.Ed.2d 388 (2015). Furthermore, when the property taken is a monetary fee, a "user fee" does not run afoul of the Fifth Amendment Takings Clause if the fee is "***reasonable***" and "is imposed for the reimbursement of ***the cost*** of government services." *United States v. Sperry Corp.*, 493 U.S. 52, 63, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). [emphasis added.]

2. **Application of the Amendment to the Reorganized Debtors is unconstitutional because the increased fees constitute a taking and not a reasonable user fee.**

Under these principles, the increased UST fee is an unconstitutional taking because it bears no relation to the cost of the U.S. trustee services rendered to the Reorganized Debtors and is thus an unreasonable user fee.

The United States Supreme Court addressed the concept of a reasonable user fee in *United States v. U.S. Shoe Corp.*, which presented a situation analogous to the present case. *See* 523 U.S. 360, 1998-2 C.B. 315, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998). In *U.S. Shoe Corp.*, the Court had to determine whether the Harbor Maintenance Tax ("HMT"), established in 26 U.S.C. § 4461(a) and applicable to goods loaded at U.S. ports for export, was a legitimate user fee. *Id.* at 363.

The Court explained that:

> The HMT, enacted as part of the Water Resources Development Act of 1986, 26 U.S.C. §§ 4461–4462, imposes a uniform charge on shipments of commercial cargo through the Nation's ports. **The charge is currently set at 0.125 percent of the cargo's value**. Exporters, importers, and domestic shippers are liable for the HMT, § 4461(c)(1), which is imposed at the time of loading for exports and unloading for other shipments, § 4461(c)(2). [emphasis added.]

*Id.* The plaintiff, U.S. Shoe Corp., paid the HMT but subsequently sought to recover the amounts paid, arguing that the HMT violated the Export Clause. *Id.* The government, however, maintained that the HMT constituted a "permissible user fee." *Id.* at 367. Ultimately, the Court did **not** agree, holding that ***the HMT was "not a fair approximation of services, facilities, or benefits furnished to the exporters, and therefore [did] not qualify as a permissible user fee.***" *Id.* at 636.

Although conducted under the Export Clause, which is less exacting than the Takings Clause,[5] the Court's discussion and analysis of the HMT provides insight into a reasonable user fee in an analogous situation. *See id.* The Court observed that the HMT was a percentage of the value of the cargo, but:

> ***The value of export cargo, however, [did] not correlate reliably with the federal harbor services used or usable by the exporter***. As the Federal Circuit noted, the extent and manner of port use depend on factors such as the size and tonnage of a vessel, the length of time it spends in port, and the services it requires, for instance, harbor dredging. See 114 F.3d, at 1572. [emphasis added.]

*Id.* at 369. Consequently, the Court rejected the government's argument that the HMT was a permissible user fee. *Id.* at 370.

The same conclusion follows here. The increased UST fee of up to $250,000 is charged whenever the debtor's quarterly disbursement equals or exceeds $1,000,000. But, if the quarterly

---

[5] *See id.* at 368-69.

disbursement is less than $1,000,000, the prior fee schedule applies, resulting in a maximum fee of $30,000. Nevertheless, **in either instance, the Trustee necessarily renders the same services**, as the number of creditors remains the same and those creditors are still entitled to receive their percentage of the disbursement, regardless of the amount of the disbursement. It appears that the **only** justification for charging a UST fee up to 833% higher than previously imposed ***for the same services*** is the fact that ***the debtor happens to be able to make a larger disbursement***. This is similar to the HMT in the *U.S. Shoe* case, which was based on the ***value*** of the cargo to be exported. The Reorganized Debtors maintain that the UST fees imposed by the Amendment cannot qualify as a reasonable user fee because they are clearly not designed to reimburse the government for the cost of the Trustee's services.

Additionally, the "economic impact" of the Amendment is immense due to the increase of up to 833%, diverting hundreds of thousands – if not millions – of dollars that would have otherwise gone to satisfy the creditors and thus interfering with the parties' financial expectations when the Reorganized Debtors filed the petition. *Cf. In re Foxcroft Square Co.*, 198 B.R. 99, 105 (Bankr. E.D. Pa.1996) (declining to find that a prior amendment to 28 U.S.C. § 1930 resulting in a slightly increased trustee fee constituted an unconstitutional taking where "[t]he accumulated additional fee in issue [was] apparently about ***$3,750*** to date, payment of which [would] apparently cause but ***a small reduction*** to the anticipated distributions" and "[t]he 'economic impact' and the 'interference with financial expectations' of the parties [were] hence ***de minimis***"). [emphasis added.] As such, because the increased UST fee is not a reasonable user fee and has an exponential economic impact, the Amendment results in an unconstitutional taking in violation of the Fifth Amendment and thus cannot be applied to the Reorganized Debtors as a matter of law. Therefore, the Reorganized Debtors additionally request that this Court grant summary judgment against the

Trustee and issue a declaratory judgment that the Amendment violates the Takings Clause of the U.S. Constitution.

## IV. CONCLUSION

For the reasons previously articulated, Plaintiffs/Debtors, SCI Direct, LLC and Suarez Corporation Industries, respectfully request that this Court enter summary judgment in favor of Plaintiffs and against Defendant, Daniel M. McDermott, United States Trustee for Region 9, on Plaintiffs' Adversary Complaint and request for a declaratory judgment that the Amendment does not apply to the Reorganized Debtors because such application: (1) would violate the presumption in favor of non-retroactive laws, (2) would violate the Due Process Clause, (3) is not permitted under the Uniformity and Bankruptcy Clauses, and (4) would result in an unconstitutional taking.

Date: February 18, 2020

Respectfully submitted,

**TZANGAS | PLAKAS | MANNOS | LTD.**


*/s/ Lauren A. Gribble*
James M. McHugh (0046636)
Lauren A. Gribble (0093627)
220 Market Avenue, South
Eighth Floor
Canton, Ohio 44702
Telephone: 330.455.6112
Facsimile: 330.455.2108
E-mail: jmchugh@lawlion.com
lgribble@lawlion.com
-and-

Anthony J. DeGirolamo (0059265)
3930 Fulton Drive, Suite 100B
Canton, Ohio 44718
Telephone: 330.305.9700
Facsimile: 330.305.9713
E-mail: ajdlaw@sbcglobal.net

*Attorneys for Plaintiffs/Reorganized Debtors SCI Direct, LLC and Suarez Corporation Industries*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 18, 2020, a true and correct copy of the foregoing was served via the Court's Electronic Case Filing System on counsel for Defendant Trustee:

- Scott R. Belhorn, Esq., scott.r.belhorn@usdoj.gov

And via regular U.S. Mail on Defendant Trustee:

- Daniel M. McDermott, Office of the United States Trustee, Howard M. Metzenbaum Federal Courthouse, 201 Superior Avenue East Suite 441, Cleveland, OH 44114

*/s/ Lauren A. Gribble*
*Attorney for Plaintiffs*

## APPENDIX

1. *Alfred Bone Shirt v. Hazeltine*, S.D. Dist. No. 01-3032-KES, 2007 WL 9735805 (April 5, 2007).

2. *Alicea v. Citizens Bank of Pennsylvania*, W.D. Penn. No. 12–1750, 2013 WL 1891348 (May 6, 2013).

2007 WL 9735805
Only the Westlaw citation is currently available.
United States District Court, D.
South Dakota, Central Division.

ALFRED BONE SHIRT; Belva Black Lance; Bonnie High Bull; and Germaine Moves Camp, Plaintiffs,
v.
Joyce HAZELTINE, in her official capacity as Secretary of the State of South Dakota; Scott Eccarius, in his official capacity as Speaker of the South Dakota House of Representatives; South Dakota House of Representatives; Arnold Brown, in his official capacity as President of the South Dakota Senate; and South Dakota Senate, Defendants.

Civ. 01-3032-KES
|
Signed 04/05/2007

**Attorneys and Law Firms**

Bryan L. Sells, Law Office of Bryan L. Sells, LLC, M. Laughlin McDonald, Atlanta, GA, Neil Bradley, Pro Hac Vice, Avondale, GA, Patrick K. Duffy, Patrick K. Duffy, LLC, Rapid City, SD, for Plaintiffs.

John P. Guhin, Sherri Sundem Wald, Attorney General of South Dakota, Timothy M. Engel, May, Adam, Gerdes & Thompson, Pierre, SD, for Defendants.

ORDER DENYING MOTION FOR EXPERT WITNESS FEES

KAREN E. SCHREIER, CHIEF JUDGE

***1** Plaintiffs move for recovery of expert witness fees pursuant to 42 U.S.C. § 1973*l*(e), as amended by the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006) (VRARA). Defendants (collectively referred to as State) dispute whether expert witness fees are recoverable. For the reasons discussed below, plaintiffs' motion is denied.

**BACKGROUND**

In November of 2001, the South Dakota Legislature enacted a statewide legislative redistricting plan. Plaintiffs filed suit contending that the plan violated §§ 2 and 5 of the Voting Rights Act. On January 29, 2002, a three-judge district court held that the plan violated § 5. SeeBone Shirt v. Hazeltine, 200 F. Supp. 2d 1150 (D.S.D. 2002). Following a nine-day bench trial, the court also held that the plan violated § 2. Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D. 2004). The court issued a Remedial Order on August 18, 2005, which redrew South Dakota's district lines. State appealed, and on August 22, 2006, the Court of Appeals for the Eighth Circuit affirmed. Bone Shirt v. Hazeltine, 461 F.3d 1011 (8th Cir. 2006).

During the pendency of State's appeal, Congress adopted VRARA. Plaintiffs sought and received a remand from the Eighth Circuit to facilitate recovery of attorneys' fees and expenses. After reaching an agreement with State regarding attorneys' fees, plaintiffs move for an order awarding expert witness fees pursuant to § 6 of the VRARA.

**DISCUSSION**

On July 27, 2006, Congress adopted VRARA. Section 6 of VRARA amended 42 U.S.C. § 1973*l*(e) and grants the court discretion to award "reasonable expert fees" to the prevailing party in a Voting Rights Act case. Plaintiffs contend that § 6 should apply to all pending cases, including this case which was pending on appeal when VRARA was adopted. State responds by arguing that plaintiffs' expert witness fees were all incurred before adoption of VRARA, and thus, an award of expert witness fees requires an impermissible retroactive application of § 6.

To determine whether a new or amended federal statute applies to a pending case, the United States Supreme Court has articulated a two-part analysis described in Martin v. Hadix, 527 U.S. 343, 119 S. Ct. 1998, 144 L. Ed. 2d 347 (1999), and Landgraf v. USI Film Products, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). The court first determines " 'whether Congress has expressly prescribed the statute's proper reach.' " Martin, 527 U.S. at 352, 119 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 280, 114 S. Ct. 1483). If clear, the Court follows Congress's intent without resorting to rules of construction. SeeLandgraf, 511 U.S. at 280, 114 S. Ct. 1483. "If there is no congressional directive on the temporal reach of a statute, [the court] determine[s] whether the application of the statute to the conduct at issue would result in a retroactive effect." Martin, 527 U.S. at 352, 119

S. Ct. 1998. The traditional presumption against retroactive application of statutes prevents application of a statute with a retroactive effect "absent clear congressional intent favoring such a result." Landgraf, 511 U.S. at 280, 114 S. Ct. 1483.

### A. Congressional Intent

***2** The court first determines whether Congress has " 'expressly prescribed' the proper reach" of § 6. Martin, 527 U.S. at 357, 119 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 280, 114 S. Ct. 1483). A statute should be applied retroactively if there is " 'clear congressional intent' favoring retroactive application ...." Id. (quoting Landgraf, 511 U.S. at 280, 114 S. Ct. 1483). There must be an " 'unambiguous directive' or 'express command' that the statute is to be applied retroactively." Id. (quoting Landgraf, 511 U.S. at 263, 114 S. Ct. 1483).

Congress did not state the temporal reach of § 6 on its face. There is no language in either § 6 or VRARA as a whole indicating whether § 6 applies to pending cases. The legislative history pertinent to § 6 provides no further insight. The only legislative history relating to § 6 is found in the House Judiciary Committee Report:

> In amending Section 14 of the VRA to explicitly include the recovery of expert costs as part of attorneys fees, the Committee seeks to update the Voting Rights Act of 1965 to comport with other Federal civil rights laws. Early in 1991, the Supreme Court held in West Virginia Hospitals, Inc. v. Casey that "Fees for services rendered by experts in civil rights litigation may not be shifted to the losing party as part of a 'reasonable attorneys fee' under § 1988." Later that same year, Congress "amended the Civil Rights Act of 1964 to strengthen and improve Federal civil rights laws," including providing for the recovery of expert fees as part of attorneys fees. In amending the Civil Rights Act of 1964, Congress specifically "recognized that evidence from one or more expert witnesses is critical to trying an employment discrimination case." The Committee finds the same to be true in the context of voting discrimination cases pursued under the relevant provisions of the VRA. The Committee received substantial testimony indicating that much of the burden associated with either proving or defending a Section 2 vote dilution claim is established by information that only an expert can prepare. In harmonizing the Voting Rights Act of 1965 with other Federal civil rights laws, the Committee also seeks to ensure that those minority voters who have been victimized by continued acts of discrimination are made whole.

H.R. Rep. No. 99-109-478, at 64-65 (2006) (footnotes omitted).

Plaintiffs contend that the committee report indicates that Congress intended § 6 to apply retroactively because Congress intended to guarantee that minority voters were "made whole," and plaintiffs here will only be made whole if they are awarded the expert fees they incurred in this case. This lone statement in the committee report falls well short, however, of an " 'unambiguous directive' or 'express command' " to apply § 6 retroactively. Martin, 527 U.S. at 354, 119 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 280, 114 S. Ct. 1483). Because Congress has not delineated the temporal reach of § 6, the court must proceed with the second step of the analysis and determine whether an award of expert witness fees in this case has a retroactive effect. Seeid.

### B. Retroactive Effect

Pursuant to the traditional presumption against retroactivity, plaintiffs cannot recover expert witness fees pursuant to § 6 if application of § 6 has a retroactive effect. SeeGonzalez v. Chertoff, 454 F.3d 813, 816 (8th Cir. 2006). "The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.' " Martin, 527 U.S. at 357, 199 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 270, 114 S. Ct. 1483). "A statute has a retroactive effect when 'it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past ....' " I.N.S. v. St. Cyr, 533 U.S. 289, 321, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001) (quoting Landgraf, 511 U.S. at 269, 114 S. Ct. 1483) (omission in original). The court's determination of retroactive effect "should be informed and guided 'by familiar considerations of fair notice, reasonable reliance, and settled expectations.' " Martin, 527 U.S. at 358, 119 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 270, 114 S. Ct. 1483).

***3** Here, State contends that an award of expert witness fees pursuant to § 6 would have a retroactive effect. The court agrees. On this issue, the Supreme Court's decision in Martin, 527 U.S. 343, 119 S. Ct. 1998, is instructive. In Martin, the Court determined the proper amount of an attorneys' fee award. The plaintiffs in Martin were two different classes of prisoners who challenged the constitutionality of conditions in Michigan prisons. By 1987, both classes of plaintiffs

had obtained either a remedial order or consent decree providing for continued supervision of Michigan prisons. As a result, plaintiffs were prevailing parties entitled to recovery of attorneys' fees pursuant to 42 U.S.C. § 1988. Seeid. at 359. Plaintiffs' attorneys would submit semiannual requests for recovery of fees that the attorneys incurred during postjudgment monitoring.

On April 26, 1996, Congress adopted the Prisoner Litigation Reform Act (PLRA). Id. As relevant here, PLRA reduced the rate of attorneys' fees recoverable under § 1988 in any action brought by a prisoner. When plaintiffs' attorneys submitted their next semiannual request, the defendants argued that the amount of the fee reward should be determined based upon PLRA's new reduced rate. Defendants argued that the reduced rate should apply to fees incurred both before and after adoption of PLRA.

The Supreme Court held that application of PLRA's reduced rate did not apply to fees incurred before adoption of PLRA. Id. at 358. The Court concluded that plaintiffs' attorneys "had a reasonable expectation that work they performed prior to enactment of the PLRA in monitoring [defendants'] compliance with the court orders would be compensated at pre-PLRA rates ...." Id. Because it would upset the reasonable expectation of the parties, application of PLRA to fees incurred before adoption of PLRA would have a retroactive effect.

Like Martin, application of § 6 here would have retroactive effect. The undisputed evidence indicates that all the expert witness fees were incurred in this case before VRARA was adopted on July 27, 2006. Additionally, before adoption of § 6 of VRARA, expert witness fees were not recoverable in Voting Rights Act cases. SeeEmery v. Hunt, 272 F.3d 1042, 1048-49 (8th Cir. 2001). As a result, when the expert witness fees were incurred in this case, the parties reasonably expected that plaintiffs could not shift those fees to State. By now permitting the shifting of expert witness fees because § 6 was adopted after those fees were incurred would attach " 'new legal consequences to events completed before [§ 6's] enactment.' " Martin, 527 U.S. at 357, 199 S. Ct. 1998 (quoting Landgraf, 511 U.S. at 270, 114 S. Ct. 1483).

Plaintiffs rely on Bradley v. School Board of City of Richmond, 416 U.S. 696, 94 S. Ct. 2006, 40 L. Ed. 2d 476 (1974), as support for the recovery of their expert witness fees. In Bradley, the plaintiffs were the prevailing students and parents in a school desegregation case. Invoking "two alternative grounds rooted in its general equity powers," the district court awarded plaintiffs their attorneys' fees. Id. at 706. The defendants appealed and while the appeal was pending, § 718 of the Education Amendments of 1972 was adopted. Section 718 empowered federal courts to award reasonable attorneys' fees in school desegregation cases. Seeid. at 709. Based on the presumption that an appellate court applies the law in effect when it renders its decision unless necessary to prevent manifest injustice, the Supreme Court held that plaintiffs were entitled to recover their attorneys' fees under § 718 even though the services were performed prior to adoption of § 718.

The court disagrees that Bradley entitles plaintiffs here to recover their expert witness fees. In Martin, 527 U.S. at 359-60, 119 S. Ct. 1998, the Supreme Court distinguished Bradley. The Martin Court noted that the district court in Bradley had awarded plaintiffs their attorneys' fees based upon the court's existing, equitable powers. Because attorneys' fees were already available under alternative theories, awarding plaintiffs their attorneys' fees based upon § 718 "did not upset any reasonable expectations of the parties." Martin, 527 U.S. at 359-60, 119 S. Ct. 1998; see alsoLandgraf, 511 U.S. at 277, 114 S. Ct. 1483 (distinguishing Bradley on the same grounds). In contrast, both the reduced fee rate in Martin and the recovery of expert witness fees here would upset the parties' reasonable expectations, and thus, application of the statute would have a retroactive effect.

***4** In sum, the award of expert witness fees pursuant to § 6 of VRARA would upset the reasonable expectation of the parties in this case and would create new legal consequences for services provided prior to adoption of § 6. As a result, application of § 6 would have a retroactive effect. And because Congress did not provide clear intent that § 6 should apply retroactively, the court refuses to apply it here. Plaintiffs' request for expert witness fees is thus denied.

Based on the foregoing, it is hereby

ORDERED that plaintiffs' motion (Docket 433) for attorneys' fees and expenses is denied to the extent it seeks recovery of expert witness fees.

**All Citations**

Slip Copy, 2007 WL 9735805

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1891348
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Osmani ALICEA, Plaintiff,
v.
CITIZENS BANK OF PENNSYLVANIA, Defendant.

Civil No. 12–1750.
|
May 6, 2013.

**Attorneys and Law Firms**

Carlos R. Diaz, R. Bruce Carlson, Carlson Lynch Ltd., Pittsburgh, PA, for Plaintiff.

Kenneth Abrams, Laura A. Lange, McGuirewoods LLP, Richmond, VA, Richard J. Cromwell, McGuire Woods, Norfolk, VA, for Defendant.

***MEMORANDUM ORDER***

NORA BARRY FISCHER, District Judge.

***1** Presently before the Court are Defendant's Motion to Dismiss Pursuant to Rule 12(b)(1) (Docket No. 6), its Brief in Support (Docket No.7) and Supplemental Brief in Support (Docket No.27), as well as Plaintiff's Brief in Opposition and Response in Opposition to same. (Docket Nos. 15, 28). Upon consideration of the parties' submissions, their argument at a Motion Hearing on April 19, 2013 (Docket No. 23), the allegations in Plaintiff's Complaint, and, in light of the relevant legal standard under Rule 12(b)(1), Defendant's Motion to Dismiss [6] is DENIED.

Plaintiff, individually and on behalf of all others similarly situated, has pled that Defendant violated the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.* and its implementing regulations, 12 C.F.R. § 205 *et seq.* (the "EFTA"), as it stood when he filed his complaint on December 3, 2012, by charging him a $3.00 ATM usage fee after allegedly failing to provide sufficient notice of said fee. (Docket Nos. 1, 15, 28). Defendant counters that Plaintiff lacks standing to assert his claim, as he has not alleged injury in fact by pleading that he was unaware of the fact that he would be charged the $3.00 ATM fee. (Docket No. 7). Thus, Defendant has launched a facial [1] attack on Plaintiff's Complaint, and moved to dismiss it under Rule 12(b)(1). Under this rule, the Court applies the Rule 12(b)(6) standard, assuming the facts pled by Plaintiff as true, and resolves all reasonable inferences in his favor. *See, e.g., Petruska v. Gannon University,* 462 F.3d 294, 302 (3d Cir.2006); *Mullen v. Thompson,* 155 F.Supp.2d 448, 451 (W.D.Pa.2001) (J. Lancaster). The Court focuses its analysis on the only true dispute between the parties, i.e., whether the pleading sets forth sufficient facts which could plausibly establish that the charged fee is enough to find injury in fact under the EFTA. (Docket Nos. 1, 12, 13). The court finds that it does.

The EFTA mandates that operators of ATMs provide notice of fees charged to consumers for use of the machine. Specifically, section 1693b(d) requires a notice of any fee to be posted on two locations: 1) on the ATM itself, and 2) on the ATM screen during a transaction. *Greiff v. Palace Entm't Holdings, LLC,* Civ. A. No. 09–1388, 2010 WL 1816300 (W.D.Pa. May 4, 2010) (J. Lancaster) (citing 15 U.S .C. § 1693b(d)(3)(B)). An ATM operator may not impose a fee in connection with any electronic fund transfer initiated by a consumer unless both notices are received by the consumer, and the consumer elects to continue the transaction. 15 U.S.C. § 1693b(d)(3)(C). Providing only one form of appropriate notice is insufficient to satisfy the statutory requirements. *Riviello v. Pennsylvania State Employees Credit Union,* Civ. A. No. 1:11–CV–1533, 2012 WL 1048813 (M.D.Pa. Mar.28, 2012), *appeal dismissed* (June 18, 2012). Further, the EFTA's implementing regulations require that ATMs that impose a fee provide the on-machine notice "in ***a prominent and conspicuous location on or at the [ATM]*** and disclose the amount of the fee ..." [2] *Reviello v. Philadelphia Fed. Credit Union,* Civ. A. No. 12–508, 2012 WL 2196320 (E.D.Pa. June 14, 2012) (citing 12 C.F.R. § 205.16(b); 12 C .F.R. § 205.16(c)(1) (emphasis added)); *see also Brown v. Wells Fargo & Co.,* 284 F.R.D. 432 (D.Minn.2012) (notice was not "prominent and conspicuous," where notice was not in capital letters, type and background of notice were in a coordinating, not contrasting, color, unlike other signs and buttons on ATMs, and notice was placed inside hood that protected the screen). As explained by the Seventh Circuit, the three elements of an EFTA claim are as follows: (1) a transfer of funds; (2) an initiation of the transfer by electronic means; and (3) a debit or credit to a consumer account. *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1328 (7th Cir.1997).

***2** As held by a majority of Courts, a violation of the statute constitutes injury in fact, and thus, a plaintiff obtains standing when the statute is violated. *Piontek v. Penn Sec. Bank & Trust Co.,* Civ. A. No. 3:10–CV–1038, 2011 WL 1002194 (M.D.Pa. Jan.31, 2011)*report and recommendation adopted,*2011 WL 1042274 (M.D.Pa. Mar.18, 2011).[3] Courts within the Third Circuit, including this District, have found standing resulting from such injury. *See e.g., Greif,* 2010 WL 1816300 (denying motion to dismiss, as plaintiff's complaint did more than establish threadbare recitals of a cause of action under the EFTA, and set forth sufficient facts to state a plausible EFTA claim against defendant); *Reviello v. Bluhm's Gas Sales, Inc.,* Civ. A. No. 3:12–CV–312, 2012 WL 5298856 (M.D.Pa. Oct.25, 2012) (denying defendant's summary judgment motion, as a genuine issue of material fact existed as to whether notice attached to machine had information regarding $1.75 surcharge fee); *Reviello v. Philadelphia Fed. Credit Union,* 2012 WL 2196320 at *2 (denying motion to dismiss, as neither the statute nor the implementing regulation "sets forth any specific requirements regarding the size, features, or other attributes of the notice," but rather requires only that the on-machine notice be placed in a prominent and conspicuous location); *Piontek,* 2011 WL 1002194 at *3. Analogously, the Third Circuit found a violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA") in *Alston v. Countrywide Financial Corporation,* 585 F.3d 753 (3d Cir.2009), constituted an injury in fact, regardless of any harm to the Plaintiff.[4] The Court recognizes that there are a minority of courts holding that a statutory violation is not sufficient to provide standing under the EFTA. *See, e.g., Charvat v. First Nat. Bank of Wahoo,* Civ. A. No. 8:12–CV–97, 2012 WL 2016184 (D.Neb. June 4, 2012). However, to the extent that the Defendant relies on *Charvat,* this Court finds this case to be unpersuasive.[5]

Instead, this Court agrees with the Plaintiff, that he has sufficiently pled all the elements of an EFTA violation. To this end, he avers that: (1) he used defendant's ATM on November 29, 2012, (*Id.* at ¶ 29); (2) ATMs transfer funds electronically; and (3) because he was charged a fee, he necessarily used the ATM to withdraw from or add funds to one of his accounts. (Docket No. 1). Though the facts stated in the Complaint do not state the precise amount that Plaintiff withdrew or deposited, the allegations are sufficient to infer that the three-element test is satisfied. Further, Plaintiff's allegations that the machine's notice was not "prominent and conspicuous," in addition to the fee of $3.00 that Plaintiff states he was charged, are sufficient to state a claim and establish statutory standing to bring this class action complaint against Defendant under §§ 1693b and 205.16(c). (*Id.* at ¶ 30) .[6] *See Mabary,* 888 F.Supp.2d 857;*see also Piontek,* 2011 WL 1002194 at *3 (plaintiff's affidavit stating that there was not a notice on the ATM itself, in concert with the use of the ATM and the fee of $2.00 that she was charged, was sufficient to establish a prima facie violation of §§ 1693b and 205.16(c) by defendant).

***3** Based on the allegations of the Complaint, the authority cited in Plaintiff's brief, as well as the Court's own research, the Court is persuaded that Plaintiff has stated allegations that constitute injury, in fact. Plaintiff's allegations are sufficient to establish a federal cause of action under the EFTA as it stood on December 3, 2012, when plaintiff filed his Complaint. *Mullen,* 155 F.Supp.2d at 451. Because Plaintiff has set forth sufficient factual matter to show that the EFTA claim is facially plausible as to Citizens Bank, Defendant's motion fails.

For these reasons,

IT IS HEREBY ORDERED that Defendant's Motion [6] is DENIED;

IT IS FURTHER ORDERED that Defendant shall file an Answer to Plaintiff's Complaint by ***May 20, 2013 at 12:00 p.m.***

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1891348

Footnotes

1 A facial attack challenges the sufficiency of the pleadings, and the court must accept the plaintiff's allegations as true. *Petruska,* 462 F.3d at 302. When a defendant attacks a complaint on its face, he "[asserts] that considering the allegations of the complaint as true, and drawing all reasonable inferences in favor of [plaintiff], the allegations of the complaint are insufficient to establish a federal cause of action." *Mullen,* 155 F.Supp.2d at 451. Dismissal is proper under Rule 12(b)(1) only when "the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2 1406, 1409 (3d Cir.1991).

2 The Court is mindful that the notice requirements changed on December 20, 2012 after the filing of this suit. (Docket No. 7 at pg. 3) (noting that Congress amended the EFTA to eliminate the on-machine notice requirement).

3 *See, e.g., among others, Frey v. Eglobal* ATM, Civ. A. No. 3:11–CV–2598–L, 2013 WL 1091237 (N.D.Tex. Mar.15, 2013) ("[T]he EFTA creates a legal right to notice of a fee for an electronic funds transaction, and the failure to receive such notice in one of the statutorily mandated forms, is, in itself, an injury in fact."); *Mabary v. Hometown Bank, N.A.,* 888 F.Supp.2d 857 (S.D.Tex.2012) (ATM operator's alleged failure to provide two statutorily mandated forms of notice of ATM fee, if proven, constituted injury-in-fact to ATM user, even if ATM screen provided user with one form of notice of fee charged, and thus, user had standing to bring putative class action against operator for violation of EFTA); *Campbell v. Hope Cmty. Credit Union,* Civ. A. No. 10–2649–STA, 2012 WL 423432, at *2 (W.D.Tenn. Feb.8, 2012); *Kinder v. Dearborn Fed. Sav. Bank,* No. 10–12570, 2011 WL 6371184, at ——4–5 (E.D.Mich. Dec.20, 2011); *In re Regions Bank ATM Fee Notice Litig.,* Nos. 2:11–MD–1000, 1001, 1002, & 2202–KS–MTP, 2011 WL 4036691, at *3 (S.D.Miss. Sept.12, 2011).

4 Defendant argues in its Supplemental Brief that *Alston* is distinguishable from the instant case, as the statutory right at issue required notice and disclosure of fees for use of an ATM, and that Plaintiff has not alleged that he failed to receive such notice, was unaware that he would be charged or was misled by the fee notice, and that thus, he has not suffered the "informational" injury that the EFTA was enacted to protect. (Docket No.27 at 1). However, just as *Alston* held that RESPA provided a right to relief "irrespective of whether the kickback caused an increase in the amount of fees charged," the EFTA provides a right to relief when the statute itself is violated. *See Frey,* 2013 WL 1091237 (N.D.Tex. Mar.15, 2013); *Mabary,* 888 F.Supp.2d 857 (S.D.Tex.2012).

5 The District Court of Nebraska acknowledged that *Charvat* is in the minority of cases, commenting that at least three district courts had held that when an ATM operator fails to provide a fee notice on the exterior of the ATM, as required by the EFTA, the statutory violation is, in itself, an injury—regardless of whether the plaintiff had actual knowledge of the fee through the on-screen notice and affirmatively accepted it. 2012 WL 2016184 at *2. The Court notes that this case is currently on appeal to the Eighth Circuit, and is scheduled for oral argument on May 14, 2013. (See No. 12–2797NE) available at: http:// www.ca8.uscourts.gov/webcal/may13***o***mh.pdf. (last visited 5/6/13).

6 The imposition of a fee is a precondition for a violation of § 1693b(d)'s notice requirements. *Clemmer v. Key Bank Nat. Ass'n,* 539 F.3d 349, 354 (6th Cir.2008).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.