**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Russ Kendig
United States Bankruptcy Judge**

**Dated: 01:03 PM September 22, 2020**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SCI DIRECT, LLC, et al., | ) | CASE NO. 17-61735 |
| | ) | |
| Reorganized Debtors. | ) | ADV. NO. 19-06056 |
| _____ | ) | |
| SCI DIRECT, LLC and SUAREZ | ) | JUDGE RUSS KENDIG |
| CORPORATION INDUSTRIES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | **MEMORANDUM OF OPINION** |
| | ) | |
| ANDREW R. VARA, United States | ) | |
| Trustee for Region 9, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.    INTRODUCTION

SCI Direct, LLC ("SCI Direct") and Suarez Corporation Industries ("Suarez Corp.") (collectively, "Plaintiffs") and their affiliates are the reorganized debtors in the underlying chapter 11 case, <u>In re SCI Direct, LLC</u>, No. 17-61735 (Bankr. N.D. Ohio). Plaintiffs filed this

adversary proceeding against the United States Trustee ("UST") for Region 9 ("Defendant")[1] on November 6, 2019, seeking a determination that amended 28 U.S.C. § 1930(a)(6)(B) is unconstitutional as applied to them in their jointly administered chapter 11 case. Plaintiffs and Defendant have filed cross-motions for summary judgment.

## II. JURISDICTION

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district. This dispute is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O). And because the dispute "stems from the bankruptcy itself," the court has constitutional authority to enter final orders and judgments. Stern v. Marshall, 564 U.S. 462, 499 (2011).[2] The court also has authority to issue a declaratory judgment in this matter under 28 U.S.C. § 2201(a). See, e.g., City of Cent. Falls v. Cent. Falls Teachers' Union, R.I. Council 94, Local 1627 (In re City of Cent. Falls), 468 B.R. 36, 44 (Bankr. D.R.I. 2012) (explaining that bankruptcy courts are permitted to issue declaratory judgments pursuant to 28 U.S.C. § 2201(a)). Venue is appropriate in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. FACTS

### A. Historical Background

The UST Program, a division of the Department of Justice, was established by Congress in 1978.[3] USTs are tasked with numerous administrative functions in bankruptcy cases, including appointing private trustees and monitoring cases for abuse and fraud. See 28 U.S.C. § 586(a), (b); see also In re Revco D.S., Inc., 898 F.2d 498, 500 (6th Cir. 1990). USTs are involved in chapter 11 cases, as they conduct initial debtor interviews, 11 U.S.C. § 341, appoint committees, 11 U.S.C. § 1102, and litigate various other matters. USTs also collect graduated, quarterly fees from chapter 11 debtors, which are based on the size of the disbursements[4] made in the case. 28 U.S.C. § 1930(a)(6). These quarterly fees, and a portion of all bankruptcy petition filing fees, are deposited into the UST System Fund established in the United States Treasury and are used to fund the UST Program. 28 U.S.C. § 589a(a), (b).

But not every federal judicial district is part of the UST Program. The UST Program was initially created as a pilot program in certain districts. Cranberry Growers Coop. v. Layng (In re Cranberry Growers Coop.), 930 F.3d 844, 854-55 (7th Cir. 2019) (citations omitted). In 1986,

---

[1] Andrew R. Vara has replaced Daniel M. McDermott as UST for Region 9. Therefore, he is automatically substituted as the defendant. See FED. R. CIV. P. 25(d), applicable in adversary proceedings pursuant to FED. R. BANKR. P. 7025.

[2] To the extent necessary, the parties have consented to this court's authority to enter final orders and judgments. See Wellness Int'l Network v. Sharif, 575 U.S. 665 (2015).

[3] Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1977).

[4] "Disbursements" include "all payments to third parties directly attributable to the existence of the bankruptcy proceeding, and that, throughout the proceeding, these payments' essential character will not change." Robiner v. Danny's Mkts., Inc. (In re Danny's Mkts., Inc.), 266 F.3d 523, 526 (6th Cir. 2001).

2

the program was instituted across the country, with the exception of the districts in North Carolina and Alabama. Id. "Those districts initially were required to opt in by 1992. Eventually, however, this opt-in requirement was removed altogether. In those districts, the functions of the Trustee are performed by Bankruptcy Administrators, who are employees of the Judicial Branch." Id. Unlike UST Program Districts, quarterly fees were originally not imposed in the Bankruptcy Administrator Districts (the "BA Districts"). Id. However, in 2000 Congress enacted 28 U.S.C. § 1930(a)(7), which provides that in BA Districts "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection." 28 U.S.C. § 1930(a)(7). Soon after 28 U.S.C. § 1930(a)(7)'s enactment, the Judicial Conference mandated the imposition of quarterly fees in BA Districts "in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time." [5]

## B. Factual and Procedural Background

Plaintiffs and their affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on August 7, 2017 (the "Petition Date"). Their cases were procedurally consolidated and jointly administered in Case No. 17-61735. Plaintiffs' joint plan of reorganization (the "Plan") was confirmed on February 25, 2019 (the "Confirmation Date") and became effective on April 18, 2019. The Plan provided that Plaintiffs would pay all quarterly fees until their chapter 11 case was closed, converted, or dismissed. (Case No. 17-61735 at ECF No. 395.)

On the Petition Date, the maximum quarterly fee that could be charged under 28 U.S.C. § 1930(a)(6) was $30,000, or $120,000 annually. However, due to a decline in bankruptcy filings and a projected budget shortfall for the UST Program, Congress enacted the Bankruptcy Judgeship Act of 2017 (the "Bankruptcy Judgeship Act") on October 26, 2017. [6] Among other things, the Bankruptcy Judgeship Act amended 28 U.S.C. § 1930(a)(6) by adding subparagraph (B) (the "2017 amendment"). The 2017 amendment significantly increased quarterly fees for chapter 11 debtors in UST Program Districts by providing:

> During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

---

[5] Report of the Proceedings of the Judicial Conference of the United States, at 45-46 (Sept./Oct. 2001), http://www.uscourts.gov/sites/default/files/2001-09_0.pdf.

[6] Pub. L. No. 115-72, div. B, § 1004, 131 Stat. 1224. See H.R. Rep. No. 115-130, at 7-9 (2017).

3

28 U.S.C. § 1930(a)(6)(B). [7] The 2017 amendment applies to disbursements made on or after January 1, 2018. [8] The fee increase was made mandatory for chapter 11 debtors in UST Program Districts. However, the Judicial Conference did not implement the 2017 amendment to BA Districts until October 1, 2018, and the fee increase only applied to disbursements made in chapter 11 cases filed on or after this date. [9]

During the first three quarters of 2019, Plaintiffs made payments and cash disbursements in the approximate amount of $6,500,000 each quarter. (Ex. 1 to Pls.' Mot. at ¶ 12, ECF No. 22-1.) If the prior version of 28 U.S.C. § 1930(a)(6) had applied, Plaintiffs would have only paid $13,000 per quarter, or $39,000 total in UST fees for the first three quarters of 2019. But Defendant, applying the 2017 amendment, submitted invoices to Plaintiffs in the amount of $64,919 per quarter, or $194,757 total for the first three quarters of 2019. (Id. at ¶ 13.) When this adversary proceeding was filed, Plaintiffs had an estimated outstanding balance of $183,242 in quarterly fees. (Ex. 1 to Pls.' Am. Compl., ECF No. 8-1.)

## IV.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the moving party meets its initial burden, the burden shifts to the non-moving party to establish the existence of a fact requiring trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. Id. at 587. But where, as here, the parties have filed cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." EMW Women's Surgical Ctr., P.S.C. v. Beshear, 920 F.3d 421, 425 (6th Cir. 2019) (quotation marks and citation omitted).

---

[7] A recent appropriations statute raised the applicable reserve threshold to $300 million for fiscal years 2020 and 2021. Department of Justice Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, § 219, 133 Stat. 2317, 2415 (2019).

[8] See Pub. L. No. 115-72. § 1004(c) (uncodified) ("The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act."); see also Clinton Nurseries, Inc. v. Harrington (In re Clinton Nurseries, Inc.), 608 B.R. 96, 109 (Bankr. D. Conn. 2019) ("Beginning January 1, 2018, quarterly fees increased in all Chapter 11 cases in all UST districts, whether new or pending"), appeal pending, Nos. 19-1428 & 19-1433 (D. Conn.).

[9] Report of the Proceedings of the Judicial Conference of the United States, at 11 (Sept. 13, 2018), https://www.uscourts.gov/sites/default/files/2018-09_proceedings.pdf.

## V.    LAW & ANALYSIS

Plaintiffs claim that the 2017 amendment: (1) is impermissibly retroactive pursuant to the Supreme Court's decision in <u>Landgraf v. USI Film Products</u>, 511 U.S. 244 (1994); (2) violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution; (3) violates the Uniformity and Bankruptcy Clauses of the U.S. Constitution; and (4) violates the Takings Clause of the Fifth Amendment of the U.S. Constitution.  Plaintiffs seek a declaratory judgment stating that the 2017 amendment does not apply to them.  Defendant maintains that the 2017 amendment is constitutional and applicable to Plaintiffs' case.

### A.  Retroactivity

Because the 2017 amendment became effective after the Petition Date, Plaintiffs claim that the 2017 amendment is impermissibly retroactive pursuant to the Supreme Court's decision in <u>Landgraf v. USI Film Products</u>, 511 U.S. 244 (1994).  Plaintiffs argue that Congress did not clearly express an intent to apply the 2017 amendment to pending cases.  Plaintiffs argue further that Defendant's application of the 2017 amendment caused them to pay far greater in quarterly fees than what they had anticipated prior to seeking bankruptcy relief, effectively attaching new legal consequences to their decision to file for bankruptcy.

When an objection is made to a statute based on retroactivity, the court must first determine whether Congress expressly prescribed the statute's temporal reach.  <u>Landgraf</u>, 511 U.S. at 280.   In the absence of express language, the court must try to discern Congress' intent using "'normal rules of construction.'"  <u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30, 37 (2006) (quoting <u>Lindh v. Murphy</u>, 521 U.S. 320, 326, (1997)).  But if the court cannot determine Congress' intent, then the court must ask whether applying the statute would have an impermissible retroactive effect, *i.e*. "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  <u>Landgraf</u>, 511 U.S. at 280.  If so, then the court must apply the presumption against retroactivity by construing the statute as inapplicable to the complaining party.  <u>See</u> <u>id</u>.

For the reasons set forth below, the court finds that Congress intended the 2017 amendment to apply to new and pending chapter 11 cases where qualifying disbursements were made on or after January 1, 2018, including Plaintiffs' case.  But even if Congress' intent was ambiguous, Defendant's application of the 2017 amendment to this case is not an impermissible retroactive application.  Thus, the presumption against retroactivity does not apply.

*1.  Congress Intended the 2017 Amendment to Apply to New or Pending Chapter 11 Cases Where Qualifying Disbursements Were Made on or After January 1, 2018*

Plaintiffs first argue that Congress did not clearly express an intent to apply the 2017 amendment to pending cases.  Plaintiffs primarily rely on the decisions in <u>Buffets</u> and <u>Life Partners</u>.  In those cases, the courts held that there is no indication from the plain text of the 2017 amendment or its legislative history that Congress intended the fee increase to apply to pending cases.  <u>In re Buffets, LLC</u>, 597 B.R. 588, 596 (Bankr. W.D. Tex. 2019) ("Nothing in the statute

or legislative history indicates that Congress intended the amendment to apply retroactively."), appeal pending sub nom. Hobbs v. Buffets, LLC, No. 19-50765 (5th Cir.); In re Life Partners Holdings Inc., 606 B.R. 277, 285 (Bankr. N.D. Tex. 2019) ("The Court is not willing to fill in the gaps in the statute and legislative history by applying the amendment to cases that were pending as of the 2017 Amendment date, especially given the astronomical increase in fees."), appeal pending sub nom. Neary v. Quilling (In re Life Partners Holdings, Inc.), No. 19-90041 (5th Cir.).

However, it appears that a majority of courts have held otherwise. In re Exide Techs., 611 B.R. 21, 26-27 (Bankr. D. Del. 2020), appeal pending, No. 20-76 (D. Del.); MF Glob. Holdings LTD. v. Harrington (In re MF Glob. Holdings LTD), 615 B.R. 415, 432 (Bankr. S.D.N.Y. 2020); In re Mosaic Mgt. Grp., Inc., 614 B.R. 615, 622 (Bankr. S.D. Fla. 2020), appeal pending sub nom. Gargula v. Smith, Nos. 20-12547, 20-12548, (11th Cir.); In re Clayton Gen., Inc., No. 15-64266, 2020 Bankr. LEXIS 842, at *13-14 (Bankr. N.D. Ga. March 30, 2020); In re John Q. Hammons Fall 2006, LLC, No. 16-21142, 2020 Bankr. LEXIS 2116, at *22-23 (Bankr. D. Kan. July 27, 2020).

The majority view was articulated in Exide. There, the Bankruptcy Court for the District of Delaware explained:

> The language of [28 U.S.C. § 1930(a)(6)(B)] indicates that the object of the amendment is not cases, but disbursements. As the UST correctly notes, the conduct that triggers liability under that section is the making of a disbursement of $1 million or more. Similarly, the temporal reach of the amendment is also expressly defined, not through case dates, but through fiscal years: 2018 through 2022. The application of the increased fees is not a function of when a case was filed or a plan confirmed; rather, the application of the increased fees is a function of the amount and timing of a disbursement and the health of the UST fund.

Id. at 26. The court also cited paragraph (c) of Section 1004 of the Bankruptcy Judgeship Act, which provides: "'The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act.'" Id. at 26-27 (quoting Pub. L. No. 115-72. § 1004(c) (uncodified)). [10] In addition, the court cited Section 1005 of the Bankruptcy Judgeship Act and explained that if Congress did not intend for the 2017 amendment to apply generally to pending chapter 11 cases, including post-confirmation cases, then Congress would have had no reason to state that the amendment did not apply to pending, post-confirmation chapter 12 cases. Id. at 27. The court concluded that the

---

[10] Statutes at large have "the force of law" even if omitted from the United States Code. Glenn v. Holder, 690 F.3d 417, 419, n. 2 (6th Cir. 2012) (citing Schmitt v. City of Detroit, 395 F.3d 327, 330 (6th Cir. 2005)); U.S. Nat'l Bank v. Independent Ins. Agents of Am., 508 U.S. 439, 448 (1993) ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112 . . .").

2017 amendment was intended to apply to all chapter 11 cases pending at the time of its enactment, as well as cases filed thereafter through 2022.  Id.

This court agrees with the court's thorough analysis in Exide.  It is clear from the language of the 2017 amendment, the specific context in which it is used, and the broader context of the statute as a whole, that Congress intended the 2017 amendment to apply to new and pending cases where qualifying disbursements were made on or after January 1, 2018, including Plaintiffs' case. [11]

### 2.  The 2017 Amendment is Not Retroactive Under Landgraf

Even if Congress' intent regarding the applicability of the 2017 amendment to pending cases was ambiguous, Defendant's application of the 2017 amendment is not an impermissible retroactive application.  Thus, the court need not apply the presumption against retroactivity by construing the 2017 amendment as inapplicable to Plaintiffs' case.

Plaintiffs argue that the 2017 amendment is impermissibly retroactive because their case was filed prior to the 2017 amendment's enactment and the amendment significantly increased the amount of their obligations to the UST.  Plaintiffs also argue that the 2017 amendment "attach[ed] a new legal significance to [their] decision to file a Chapter 11 petition in contravention of the parties' expectations."  (Pls.' Mot., ECF No. 22, at 19.)

In Landgraf, the Supreme Court explained that a statute creates an impermissible retroactive effect when it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed."  511 U.S. at 280.  But the Court also stated that a statute does not operate retroactively "merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law."  Id. at 269 (citation omitted).

Plaintiffs correctly point out that their case was pending prior to the 2017 amendment's enactment on October 26, 2017.  But the 2017 amendment only applied to qualified disbursements made on or after January 1, 2018.  And Plaintiffs were not even assessed higher fees under the 2017 amendment until qualified disbursements were made in 2019.  Therefore, it cannot be said that the 2017 amendment impaired Plaintiffs' rights, increased Plaintiffs' liability for past conduct or imposed new duties with respect to any of Plaintiffs' completed transactions.  Most courts that have addressed this issue have reached the same conclusion.  See, e.g., MF Glob., 615 B.R. at 432 (rejecting retroactivity argument and explaining that "[w]hile the Plaintiffs and their creditors may have harbored different expectations about what the future held, UST fees included, the increase did not affect any rights under their plans."); Exide, 611

---

[11]  This interpretation is also consistent with the Congressional Budget Office's cost estimate, which assumed that the 2017 amendment would apply to pending chapter 11 cases.  Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 1 (May 18, 2017), https://www.cbo.gov/system/files/2018-07/52739-hr2266.pdf.  See, e.g., MF Glob., 615 B.R. at 430 ("If the 2017 Amendment did not apply to pending cases, it would not have generated the funds the CBO estimated had to be generated to meet the funding requirements of the 2017 Act.  Thus, the only permissible inference is that Congress adopted the CBO's funding assumption without which the 2017 Amendment would not have worked.").

B.R. at 29 ("imposing increased quarterly fees does not attach new legal consequences to completed transactions."); In re Cir. City Stores, Inc., 606 B.R. 260, 268-69 (Bankr. E.D. Va. 2019) ("A mere increase in the quarterly U.S. Trustee fee is not substantively retroactive."), appeal pending sub nom. Fitzgerald v. Siegel, No. 19-2240 (4th Cir.)

Plaintiffs rely heavily on Alfred Bone Shirt v. Hazeltine, No. 01-3032, 2007 WL 9735805 (D.S.D. April 5, 2007), aff'd, 524 F.3d 863 (8th Cir. 2008) in support of their argument. But Alfred Bone Shirt is distinguishable. In that case, the plaintiffs were the prevailing party in an action challenging a statewide legislative redistricting plan under the Voting Rights Act. During the appeal, Congress enacted an amendment that would permit the plaintiffs to recover expert witness fees. But when the plaintiffs sought to recover fees under the amendment, the court denied their request. The court held that the amendment was impermissibly retroactive because it would permit the plaintiffs to recover expert witness fees from the defendants, a previously non-existent liability, after the fees were already incurred. Id. at *3. Here, in contrast, the 2017 amendment modified Plaintiffs' *existing duty* to pay quarterly fees. And it only applied to qualified disbursements made in quarters *subsequent* to its enactment. Thus, unlike the amendment in Alfred Bone Shirt, the 2017 amendment did not attach new legal consequences to events completed prior to its enactment.

Plaintiffs cite numerous other cases where courts have declined to apply statutes retroactively because either the express language of the statute indicated it was to be applied prospectively or the statute was silent or ambiguous regarding its temporal scope. [12] However, because this court finds that: (1) Congress intended the 2017 amendment to apply to pending chapter 11 cases; and (2) the 2017 amendment is not impermissibly retroactive, these cases are distinguishable. Therefore, Plaintiffs' retroactivity claim fails.

---

[12] See Turkhan v. Perryman, 188 F.3d 814, 825-27 (7th Cir. 1999) (reiterating previous holding that Congress was silent with respect to whether it intended section 440(d) of the AEDPA to apply retroactively); Craig v. Eberly, 164 F.3d 490, 494 (10th Cir. 1998) (holding that Congress did not intend section 1997e(e) of the PLRA to apply retroactively); Sarmiento Cisneros v. U.S. Atty. Gen., 381 F.3d 1277, 1281 (11th Cir. 2004) (holding that Congress did not intend 8 U.S.C. § 1231(a)(5) to apply retroactively); United States v. Miller, 911 F.3d 638, 645-46 (1st Cir. 2018) (holding that the temporal reach of a 2003 amendment to the Mann Act was uncertain); Jaghoori v. Holder, 772 F.3d 764 (4th Cir. 2014) (holding that Congress did not expressly intend to apply 8 U.S.C. § 1229b(d)(1)(B) retroactively); Siding & Insulation Co. v. Alco Vending Inc., 822 F.3d 886, 892 (6th Cir. 2016) (declining to apply 47 C.F.R. § 64.1200(f)(1) retroactively as this would increase liability for past conduct and run against considerations of fair notice, reasonable reliance, and settled expectations); Monoson v. United States, 516 F.3d 163, 167-69 (3d Cir. 2008) (declining to apply section 555 of the STRE Act retroactively since Congress did not clearly indicate whether it intended the statute to apply retroactively or prospectively); Yue v. Brown, 92 F. Supp. 2d 1236, 1242-45 (D.N.M. 2000) (declining to defer to agency interpretation of section 101(a)(27)(J) of the Immigration and Nationality Act and holding that the statute was intended to apply prospectively, not retroactively); Alicea v. Citizens Bank of PA., No. 12-1750, 2013 WL 1891348, at *3 (W.D. Pa. May 6, 2013) (failing to engage in any analysis regarding retroactivity but holding that the plaintiff alleged sufficient facts to support a claim under the EFTA as it stood when plaintiff filed his complaint).

### B. Due Process [13]

Next, Plaintiffs claim that Defendant's application of the 2017 amendment violates their rights under the Due Process Clause. Plaintiffs' due process claim is largely based on their argument that the 2017 amendment is retroactive under Landgraf. (Pls.' Mot., ECF No. 22, at 20.) Plaintiffs also argue that their due process rights were violated because they lacked adequate notice of the 2017 amendment when they decided to file for bankruptcy.

Plaintiffs' due process claim fails for several reasons. First, for the reasons already stated, the 2017 amendment is not retroactive under Landgraf. Second, Plaintiffs had adequate notice of the 2017 amendment, given that it went into effect more than a year before the Confirmation Date and before any qualifying disbursements were made. Third, even if the 2017 amendment was retroactive, the 2017 amendment is supported by a legitimate legislative purpose furthered by rational means.

#### 1. Plaintiffs had Adequate Notice of the Fee Increase

Plaintiffs claim that they did not have sufficient notice of the "exponential fee increase when they decided to pursue Chapter 11 bankruptcy, invested time and effort in preparing the petition, and began working with the court and creditors to develop a plan of reorganization." (Pls.' Mot., ECF No. 22, at 22.) Plaintiffs argue that had they known about the size of fee increase, they "could have attempted to restructure debts outside of bankruptcy before they considered filing for bankruptcy." (Id. at 23, citing Ex. 1 to Pls.' Mot. at ¶ 11, ECF No. 22-1.)

Plaintiffs once again rely on the decisions in Buffets and Life Partners for support, but those cases involved debtors with plans that were *already confirmed* prior to January 1, 2018. Buffets, 597 B.R. at 591, 596; Life Partners, 606 B.R. at 280-81. Here, the 2017 amendment went into effect more than a year before Plaintiffs' Plan was confirmed and any qualifying disbursements were made. Thus, Plaintiffs had ample notice of the fee increase and time to explore alternatives with creditors. See, e.g., Clayton, 2020 Bankr. LEXIS 842, at *16 (rejecting due process challenge to the 2017 amendment and explaining that the parties "had the option to make other decisions" since the 2017 amendment took effect before the plan was confirmed); MF Glob., 615 B.R. at 436 ("The Due Process Clause does not require Congress to give personal notice to affected parties before enacting a change in fees or taxes, even when (unlike here) those changes are tied to past conduct." (citation omitted)).

Furthermore, chapter 11 debtors have long been required to pay quarterly UST fees, and the fee amounts have periodically changed over the years. Therefore, any expectation by Plaintiffs that the old fee schedule would continue to govern disbursements indefinitely was unreasonable. See, e.g., MF Glob., 615 B.R. at 436 (rejecting due process challenge to the 2017 amendment and explaining that "[n]either Plaintiff nor any of its stakeholders could reasonably expect that the quarterly fees would not increase. Increased fees are like increased taxes. The taxpayer hopes they do not go up but, notwithstanding that hope, they sometimes do.");

---

[13] Some of the facts and discussion hereinafter may be relevant to the points raised above and vice versa.

Landgraf, 511 U.S. at 269 (noting that a statute does not operate retroactively "merely because it . . . upsets expectations based in prior law." (citation omitted)).

      *2.   The 2017 Amendment Does Not Violate the Due Process Clause*

      When retroactive economic legislation is challenged on due process grounds, a deferential standard of review applies:

> Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches . . .
>
> To be sure, . . . retroactive legislation does have to meet a burden not faced by legislation that has only future effects . . . The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former . . . But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

U.S. v. Carlton, 512 U.S. 26, 30, 31 (1994) (quotation marks and citations omitted). The party challenging legislation under the Due Process Clause has the burden of proving that Congress acted in an irrational and arbitrary way. E. Enters. v. Apfel, 524 U.S. 498, 537 (1998) (citing Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1978)).

      The majority of courts have held that the 2017 amendment does not violate the Due Process Clause. See Exide, 611 B.R. at 31; MF Glob., 615 B.R. at 436; Mosaic, 614 B.R. at 622; Clayton, 2020 Bankr. LEXIS 842, at *16. Once again, this court again adopts the reasoning of the court in Exide. In Exide, the court explained:

> in enacting the 2017 Amendment Congress had a legitimate legislative purpose: to prevent revenue loss and preserve the UST Program's self-funded character . . . Congress's decision to impose higher fees on larger pending chapter 11 cases is rationally related to that goal. It is logical for Congress to assume that larger cases tax the UST system more than smaller cases and that the size of the case can be determined by the amount of disbursements made by the particular debtor. In addition, applying the increased fees to pending cases, including confirmed cases, is rational as it spreads the costs among more chapter 11 debtors and allows Congress's funding goal to be met more quickly . . . Lastly, the Court concludes that the deposit of 2% of fees collected into the general fund of the U.S. Treasury is rational. The increased fees are meant to offset not only the UST appropriations but also the

10

costs of the 18 new bankruptcy judgeships created by the 2017
Amendment.

Exide, 611 B.R. at 31 (citations and quotation marks omitted).  Accordingly, Plaintiffs' due
process claim fails.

## C. Uniformity

Next, Plaintiffs claim that the 2017 amendment, as applied to them, is unconstitutional
under the Uniformity and Bankruptcy Clauses.  Plaintiffs argue that even though UST Program
Districts were required to adopt the increased fee schedule, the Judicial Conference did not
implement the 2017 amendment to BA Districts until October 1, 2018, and the 2017 amendment
was explicitly made applicable only to chapter 11 cases filed on or after this date.  Thus, debtors
with pending cases in BA Districts at the time the 2017 amendment was enacted were not liable
for the increased fees, whereas debtors with pending cases in UST Program Districts were liable.
Consequently, Plaintiffs argue that Defendant's application of the 2017 amendment to their case
violates the Uniformity and Bankruptcy Clauses.  This is not the law.

### 1.  The Uniformity Clause Does Not Apply

As a preliminary matter, the Uniformity Clause does not apply to this dispute.  The
Uniformity Clause states that Congress shall have the power to "lay and collect Taxes, Duties,
Imposts and Excises . . . but all Duties, Imposts and Excises shall be uniform throughout the
United States."  U.S. CONST. art. I, § 8, cl. 1.  But the quarterly fees imposed under 28 U.S.C.
§§ 1930(a)(6), and (7) are plainly not "Duties," "Imposts," or "Excises" subject to the conditions
of the Uniformity Clause, and at no point in their briefs did Plaintiffs even appear to argue
otherwise.  Instead, as Defendant correctly points out, the quarterly fees "are user fees, payable
only by debtors or others in ongoing chapter 11 cases, for the purpose of funding the bankruptcy
system they are using."  (Def.'s Mot., ECF No. 23, at 22.) (citations omitted). [14]  User fees,
unlike certain taxes, are not subject to the constitutional restrictions imposed by the Uniformity
Clause.  See, e.g., Thomson Multimedia, Inc. v. U.S., 340 F.3d 1355, 1363-64 (Fed. Cir. 2003)
(holding that the Harbor Maintenance Tax under 26 U.S.C. §§ 4461-4462 as applied in that case
was "outside the scope of the Uniformity Clause's prohibitions" because it was a user fee, not a
tax).  Therefore, the Uniformity Clause does not apply.

### 2.  The 2017 Amendment Does Not Violate the Bankruptcy Clause

The Bankruptcy Clause provides that Congress shall have the power "[t]o establish . . .
uniform Laws on the subject of Bankruptcies throughout the United States[.]"  U.S. CONST. art.
I, § 8, cl. 4.  The Supreme Court recently explained the impetus of the Bankruptcy Clause:

> The Bankruptcy Clause emerged from a felt need to curb the
> States' authority.  The States had wildly divergent schemes for
> discharging debt, and often refused to respect one another's

---

[14]  Plaintiffs do not dispute this characterization.  In fact, they characterize the quarterly fees as "unreasonable user
fees" later in their brief.  (Pls.' Mot., ECF No. 22, at 34.)

discharge orders.  The Framers' primary goal in adopting the
Clause was to address that problem—to stop competing sovereigns
from interfering with a debtor's discharge.  And in that project, the
Framers intended federal courts to play a leading role.  The
nation's first Bankruptcy Act, for example, empowered those
courts to order that States release people they were holding in
debtors' prisons.  So through and through, the Bankruptcy Clause
embraced the idea that federal courts could impose on state
sovereignty.  In that, it was *sui generis*—again, unique—among
Article I's grants of authority.

Allen v. Cooper, -- U.S --, 140 S. Ct. 994, 1002 (2020) (citations, quotation marks, and
alterations omitted).  "To properly enact a law under the Bankruptcy Clause, legislation must
meet two criteria: [1] the law must be on the subject of bankruptcies, and [2] the law must be
uniform throughout the United States."  Exide, 611 B.R. at 34.  Both criteria are satisfied in this
case.

        a.   The 2017 Amendment is a Law on the Subject of Bankruptcies

        The Supreme Court has defined bankruptcy as "the subject of the relations between an
insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief."
Ry. Labor Executives' Ass'n v. Gibbons, 455 U.S. 457, 466, 470-71 (1982) (quotation marks
and citations omitted) (holding that the Rock Island Railroad Transition and Employee
Assistance Act,which ordered a debtor railroad company's bankruptcy estate to pay benefits to
former employees of the debtor, was a law on the subject of bankruptcies and violated the
Bankruptcy Clause).  The Court has also stated that "[t]he Framers would have understood the
Bankruptcy Clause's grant of power to enact laws on the entire 'subject of Bankruptcies' to
include laws providing, in certain limited respects, for more than simple adjudications of rights
in the res."  Cent. Va. Cmty. College v. Katz, 546 U.S. 356, 370 (2006) (holding that sovereign
immunity did not block preferential transfer actions because they were authorized by Bankruptcy
Clause's grant of *in rem* jurisdiction).

        Here, the 2017 amendment is part of 28 U.S.C. § 1930, which is literally titled
"[b]ankruptcy fees."  Section 1930 only imposes fees in bankruptcy cases, and the fees are used
to fund the UST Program which is part of the bankruptcy system.  See 28 U.S.C. § 589a(a), (b).
In addition, the fees imposed under § 1930 receive administrative claim treatment in bankruptcy
cases, which means that "any increase or decrease in fees payable to the U.S. Trustee affects the
amount of funds available for distribution to lower-priority creditors and the debtor."  Life
Partners, 606 B.R. at 287-88 (citing 11 U.S.C. § 507(a)(2)).  Thus, the 2017 amendment is
clearly a law on the subject of bankruptcies.  It appears that every court to address the
constitutionality of the 2017 amendment under the Bankruptcy Clause has reached the same
conclusion.  Life Partners, 606 B.R. at 287-88; Exide, 611 B.R. at 35-36; MF Glob., 615 B.R. at
445-46; Mosaic, 614 B.R. at 623; Clayton, 2020 Bankr. LEXIS 842, at *20-21; Buffets, 597 B.R.
at 594-95; John Q. Hammons Fall 2006, 2020 Bankr. LEXIS 2116, at *22-23; Cir. City Stores,
606 B.R. at 269-70.

Nevertheless, Defendant contends that the 2017 amendment was enacted under the Necessary and Proper Clause, not the Bankruptcy Clause. But the Necessary and Proper Clause, standing alone, is not a source of congressional power. Kinsella v. U.S. ex rel. Singleton, 361 U.S. 234, 247 (1960). Rather, Congress' exercise of authority pursuant to that clause must be: (1) tethered to one of Congress' existing enumerated powers; and (2) within the scope of what is permitted under that power. See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 559, 560 (2012) (finding that the individual mandate of the Patient Protection and Affordable Care Act of 2010 could not be upheld under the Necessary and Proper Clause because the mandate was neither narrow in scope nor incidental to Congress' exercise of power under the Commerce Clause). [15] Thus, Defendant's argument fails.

    b. The 2017 Amendment is Uniform Under the Bankruptcy Clause

Having determined that the 2017 amendment is a law on the subject of bankruptcies, the court must now determine whether the law is constitutionally uniform. A law enacted pursuant to the Bankruptcy Clause must: (1) apply uniformly to a defined class of debtors; and (2) be geographically uniform. Gibbons, 455 U.S. at 473; Schultz v. U.S., 529 F.3d 343, 351 (6th Cir. 2008). However:

> The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems. The problem dealt with under the Bankruptcy Clause may present significant variations in different parts of the country . . . the uniformity clause was not intended to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions.

Reg'l Rail Reorg. Act Cases, 419 U.S. 102, 159 (1974) (citations, alterations, and quotation marks omitted) (holding that the Regional Railroad Reorganization Act, which only applied to rail carriers in certain regions and to railroads that were reorganizing within a certain time period, was uniform under the Bankruptcy Clause because it was designed to solve a national rail transportation crisis that began when eight major railroads initiated reorganization proceedings). [16]

This court agrees with the majority of courts that have upheld the constitutionality of the 2017 amendment under the Bankruptcy Clause. Exide, 611 B.R. at 36-38; MF Glob., 615 B.R. at 446-48; Clayton, 2020 Bankr. LEXIS 842, at *21-27; John Q. Hammons Fall 2006, 2020

---

[15] In its response, Defendant argues for the first time that the quarterly fees are necessary and proper to execute Congress' power to establish courts pursuant to Article 1, Section 8, Clause 9 of the U.S. Constitution. Defendant's argument is a stretch, given that 28 U.S.C. § 1930's primary purpose is not to regulate the conduct of bankruptcy courts or the means by which their judgments are enforced, cf. Willy v. Coastal Corp., 503 U.S. 131, 136 (1992), but rather to fund the UST Program, 28 U.S.C. § 589a(a), (b).

[16] "Over two centuries after its adoption, it is quite clear the Bankruptcy Clause is a source of congressional power far more often than it is a serious limitation." Stephen J. Lubben, A New Understanding of the Bankruptcy Clause, 64 CASE W. RES. L. REV. 319, 411 (2013).

Bankr. LEXIS 2116, at *21-23.  First, the 2017 amendment applies to a specific class of debtors: chapter 11 debtors in UST Program Districts who make qualified disbursements during the years 2018-2022.  Indeed, the 2017 amendment is not a "private bankruptcy bill" applicable to a single debtor.  Cf. Gibbons, 455 U.S. at 470-71.  Second, the law remedies a geographically isolated problem that is unique to UST Program Districts, *i.e.* the depletion of the UST System Fund. Exide, 611 B.R. at 37.  As the court stated in MF Global: "The BA Districts do not support the UST Fund and the UST Fund does not support the BA Program.  The Plaintiffs do not challenge the dual UST/BA system as unconstitutional, and as long as the two regimes co-exist, they will face funding problems that may be unique to only one of them."  615 B.R. at 447-48. [17]  Thus, the 2017 amendment is uniform under the Bankruptcy Clause.

## D.  The Takings Clause

Finally, Plaintiffs claim that Defendant's application of the 2017 amendment to their case violates the Takings Clause of the Fifth Amendment and constitutes an unreasonable user fee. The court disagrees.

The Fifth Amendment provides in relevant part that private property shall not "be taken for public use, without just compensation."  U.S. CONST. amend. V.  "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. U.S., 364 U.S. 40, 49 (1960).

The standard for assessing the constitutionality of user fees under the Takings Clause was illustrated in United States v. Sperry Corp., 493 U.S. 52 (1989).  Sperry involved section 502 of the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, which required the deduction of a user fee of up to 1.5% of the first $5 million and 1% of any amount over $5 million from awards obtained by American claimants before the Iran-U.S. Claims Tribunal.  An American company challenged the constitutionality of the statute, arguing that it violated the Takings Clause because the deduction did not approximate the cost of the Iran-U.S. Claims Tribunal to the United States and did not bear any relationship to the company's use of the Tribunal or the value of the Tribunal's services to the company.  The Supreme Court rejected the company's argument.

---

[17]  Plaintiffs rely on St. Angelo v. Victoria Farms, Inc., 38 F.3d 1525 (9th Cir. 1994), modified, 46 F.3d 969 (9th Cir. 1995), where the Ninth Circuit held that the absence of quarterly fees in BA Districts rendered 28 U.S.C. § 1930 non-uniform under the Bankruptcy Clause.  But the "proper focus" in this case is whether the 2017 amendment, not the dual UST/BA system, is constitutionally uniform.  Exide, 611 B.R. at 33-34.  And even if it was proper to consider the fees charged in BA Districts, 28 U.S.C. §§ 1930(a)(6) and (7) are uniform.  Section 1930(a)(7) authorized the Judicial Conference to impose quarterly fees equal to those imposed in UST Program Districts, and the Judicial Conference mandated the imposition of quarterly fees in BA Districts in an amount equal to what is charged in UST Program Districts.  Report of the Proceedings of the Judicial Conference of the United States, at 45-46 (Sept./Oct. 2001), http://www.uscourts.gov/sites/default/files/2001-09_0.pdf.  Thus, "the Judicial Conference exercised its discretion under section 1930(a)(7) long before enactment of the 2017 Amendments and rendered subsections 1930(a)(6) and (a)(7) uniform in their effect.  While the Judicial Conference separately resolved to delay the imposition of the increased fees and limited the increase to new cases, non-uniform implementation of a uniform law does not render the law non-uniform."  MF Glob., 615 B.R. at 448, n. 20 (citation omitted).

The Court explained: "This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. Nor does the Government need to record invoices and billable hours to justify the cost of its services. All that we have required is that the user fee be a 'fair approximation of the cost of benefits supplied.'" Sperry, 493 U.S. at 60 (quoting Mass. v. U.S., 435 U.S. 444, 463, n. 19 (1978)). Because the 1.5% deduction was designed for the reimbursement of government services, and because the American company clearly benefited from its use of the Tribunal, the Court held that the deduction did not constitute a "taking" under "any standard of excessiveness." Sperry, 493 U.S. at 62-64. The Court also appeared to reject the proposition that any user fee could constitute a "physical occupation requiring just compensation." Id. at 62, n. 9.

As noted earlier, the UST quarterly fees are user fees. However, Plaintiffs contend that the fees are unreasonable and excessive. Specifically, Plaintiffs argue:

> The increased UST fee of up to $250,000 is charged whenever the debtor's quarterly disbursement equals or exceeds $1,000,000. But if the disbursement is less than $1,000,000, the prior fee schedule applies, resulting in a maximum fee of $30,000. Nevertheless, in either instance, the Trustee necessarily renders the same services, as the number of creditors remains the same and those creditors are still entitled to receive their percentage of the disbursement, regardless of the amount of the disbursement. It appears that the only justification for charging a UST fee up to 833% higher than previously imposed for the same services is the fact that the debtor happens to be able to make a larger disbursement . . . The Reorganized Debtors maintain that the UST fees imposed by the Amendment cannot qualify as a reasonable user fee because they are clearly not designed to reimburse the government for the cost of the Trustee's services.

(Pls'. Mot., ECF No. 22, at 34-35.) (citation omitted).

Plaintiffs' argument misses the mark. The UST fees are "user fees associated with the debtors' use of the bankruptcy system." Exide, 611 B.R. at 20 (citation omitted). They are imposed on disbursements made in chapter 11 cases in order to fund the UST Program. 28 U.S.C. § 589a(a), (b). And they were increased by the 2017 amendment in order to fund a projected shortfall for the UST Program. [18] Plaintiffs are reorganized chapter 11 debtors who have clearly benefited from their use of the bankruptcy system and the UST Program. It is true that chapter 11 debtors, like Plaintiffs, who make larger disbursements are charged a higher amount in UST fees. But user fees need not be "precisely calibrated" to a party's use of government services. Sperry, 493 U.S. at 60. And "[i]t is permissible for Congress to impose higher user fees on large chapter 11 debtors to reflect both a fair approximation of the benefits

---

[18] See H.R. Rep. No. 115-130, at 7-9 (2017).

conferred and Congress' assumption that larger, more complex cases tax the system more than smaller ones." Exide, 611 B.R. at 33.

In addition, the UST fees are not unconstitutionally excessive. The 2017 amendment limits UST fees in cases where disbursements exceed $1 million to the lesser of 1% of the disbursements or $250,000. In Sperry, the Supreme Court upheld a 1.5% user fee. Plaintiffs are correct that the Court in Sperry limited its decision to the facts of that case and did not specify what percentage would constitute a taking. However, in Sperry there was no dollar cap or sunset provision on the user fee, the company's use of the Tribunal was involuntary, and the user fee was expressly retroactive. Here, the UST fees are capped at $250,000, there is a sunset provision, Plaintiffs' use of the bankruptcy system was voluntary, and the fee schedule only applies to qualified disbursements made in quarters subsequent to its enactment. Thus, the UST fees are, in many aspects, less burdensome than the fee upheld in Sperry.

Finally, Plaintiffs rely on the Supreme Court's decisions in United States v. U.S. Shoe Corp., 523 U.S. 360 (1998) and Massachusetts v. United States, 435 U.S. 444 (1978). But neither of those cases involved a challenge to a user fee under the Takings Clause. This court agrees with the courts that have upheld the constitutionality of the 2017 amendment under the Takings Clause. See Exide, 611 B.R. at 33; MF Glob., 615 B.R. at 443.

## VI.    CONCLUSION

The court is sympathetic to the fact that Plaintiffs are ultimately required to pay a much larger amount in UST fees than what they expected prior to seeking bankruptcy relief. The court also recognizes that dramatically increasing quarterly fees for chapter 11 debtors in pending cases may ultimately hinder one of the chief purposes of chapter 11, which is to preserve going concerns. See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999). But whatever the wisdom of Congress' decision, the 2017 amendment is constitutional and applicable to Plaintiffs' case. Therefore, the court will grant Defendant's motion for summary judgment.

**Service List:**

Anthony J. DeGirolamo
3930 Fulton Drive NW, Suite 100B
Canton, OH 44718

James M. McHugh
Lauren A. Gribble
Tzangas Plakas Mannos Ltd
220 Market Avenue, South, 8th Floor
Canton, OH 44702

Suzana Krstevski Koch
United States Attorney's Office, NDOH
801 W. Superior Avenue
Suite 400
Cleveland, OH 44113

Maria D. Giannirakis
Scott R. Belhorn
Office of the U.S. Trustee
H.M. Metzenbaum U.S. Courthouse
201 Superior Avenue East Suite 441
Cleveland, OH 44114-1240